804 N.E.2d 258 (2004)
In the Matter of the TERMINATION OF the PARENT-CHILD RELATIONSHIP OF D.D.
Anna Peterson, Mother, Appellant-Respondent,
v.
Marion County Office of Family and Children, Appellee-Petitioner,
and
Child Advocates, Inc., Appellee/Guardian Ad Litem.
No. 49A02-0306-JV-461.
Court of Appeals of Indiana.
March 4, 2004.
*260 Jan B. Berg, Indianapolis, IN, Attorney for Appellant.
Elizabeth G. Filipow, Indianapolis, IN, Attorney for Appellee.

*259 OPINION
SHARPNACK, Judge.
Anna Peterson ("Mother") appeals the trial court's termination of her parental rights to her minor son, D.D. Mother raises five issues, which we consolidate and restate as whether the trial court's order terminating Mother's parental rights to D.D. is clearly erroneous. We affirm.
The relevant facts follow. Mother and Keith Doverspike lived together with their two children, G.D. and A.D., and Mother's son from a prior relationship, D.D., who was born in 1993 (collectively, the "Children").[1] In October 2000, the trial court granted a petition filed by the Marion County Office of Family and Children ("MCOFC"), which alleged that D.D., G.D., and A.D. were children in need of services ("CHINS"). The petition alleged that D.D. had been physically abused by Doverspike and that Mother had failed to protect the Children and had exposed them to an endangering environment. As a result, the Children were removed from the home.
Doverspike filed a protective order, and Mother was ordered to leave the home in December 2000. Subsequently, the Children were returned to Doverspike for an in-home trial visitation. Due to concerns regarding Mother's mental health and substance abuse, the Children were not returned to Mother. The CHINS proceeding was later closed as to G.D. and A.D. However, the CHINS proceeding regarding D.D. continued, and Mother was offered a variety of services.
In August 2001, the MCOFC filed a petition to terminate Mother's parental rights to D.D. The trial court heard evidence on the petition on August 5, 2002, November 20, 2002, February 7, 2003, and March 26, 2003. The trial court then found the following:
7. [D.D.] was initially removed from the care of [Mother] due to allegations of physical abuse by the step-father, Keith Doverspike, and [Mother's] inability to protect [D.D.]. The reasons for the continued placement of [D.D.] outside of the care and custody of [Mother] include her misuse of prescription drugs, her mental illness diagnoses and attendant erratic behavior, her failure to follow through with mental health treatment, and her inability to provide a safe consistence nurturing residence and environment for [D.D.], all of which endangers him.
8. Since removal from [Mother], [D.D.] has not been returned to her care and custody.
9. [Mother] has been diagnosed with a number of mental health problems, including borderline personality disorder, depression, and anxiety.
10. [Mother] has a history of substance abuse, including abuse of prescription drugs, marijuana and alcohol. Because of her history of substance abuse and her self-reported treatment history of two prior referrals for substance abuse treatment, it was recommended by substance abuse professionals at Winona Hospital that [Mother] attend either an Intensive Outpatient Program or *261 an Inpatient Program to deal with issues of substance abuse. However, since initiation of the CHINS case she has attended neither. Substance abuse represents a safety issue to [Mother] in that it can interfere with her compliance with medications prescribed for her mental health issues.
11. The following services have been offered and available to [Mother] since initiation of the CHINS action with regard to her children: a Parenting Assessment, Project Safe Families for domestic violence issues, substance abuse evaluation and treatment through Midwest Psychological Center and Winona Hospital, psychiatric evaluations through Psychological Laboratories and Adult and Child, home-based counseling through Midwest Psychological Center, supervised visitation, housing through various shelters and transitional housing facilities, psychiatric care and medications through Gallahue Community Health and Behavioral Care South, urine drug screens through Valle Vista Hospital, and financial help and counseling through the ACES Project.
12. Home-based counseling services were provided to [Mother] through Midwest Psychological Center. The treatment goals for [Mother] were to help her address her mental health issues, help her maintain her medications and to maintain visits between [Mother] and [D.D.]. [Mother] was being seen by a psychiatrist at Behavioral Care South during this time. The home-based counselor also set up another appointment with a psychiatrist at Midwest Psychological Center. The home-based counselor encouraged [Mother] to take her medications and to attend appointments with her psychiatrist.
13. The home-based counselor made referrals for housing, including apartments and shelters. During the time she received home-based counseling at Midwest, [Mother] did not have stable housing or employment. [Mother] admitted to the home-based counselor that she sometimes took her prescription medications and sometimes took over the counter diet pills, and that she smoked marijuana. The home-based counselor warned her that not only was it dangerous to mix marijuana with her prescription medications, but that use of it would violate a shelter's rules, such that she might be asked to leave. [Mother] also threatened the MCOFC Case Manager in the presence of the home-based counselor. She also made comments that she might have to take [D.D.] away and directed a threat at [Doverspike], indicating that she had a weapon and might use it.
14. The home-based counselor closed her case as to [Mother] and referred her to the Action Coalition to Ensure Stability ("ACES"), an agency that could help her with more intensive services directed at persons with mental health issues. At the time she closed her case, significant concerns existed regarding [Mother's] ability to safely provide for [D.D.], due to her lack of consistency in taking her medications, her lack of stable residence and employment, and the violent outbursts, suicide attempts and emotional instability demonstrated by [Mother].
*262 15. Susan Gerber of ACES has provided services to [Mother] since early in 2001. In order to be admitted to the ACES program, a client must have mental health issues, a substance use or abuse disorder, and be homeless or at risk for becoming homeless. [Mother] met the criteria for the program. ACES is designed to provide a link to necessary services for its clients.
16. Susan Gerber and [Mother] developed a Resource Coordination Plan, which identified the following treatment goals: working on [Mother's] "hidden" issues, establishing and maintaining suitable housing, and remaining free of mind and mood-altering substances, such as opiates and alcohol. Another goal was mental health stability.
17. When she began working with ACES, [Mother] was receiving her psychiatric care through Behavior Care South and Midwest Psychological Services. Susan Gerber was aware of [Mother's] psychiatric diagnoses, and had training and experience in recognizing the symptoms of these.
18. Susan Gerber told [Mother] that compliance with her prescribed medications was very important to obtaining and maintaining mental health stability and encouraged her on numerous occasions to take her medications as prescribed. However, [Mother] reported a pattern of mixed compliance and non-compliance with her prescribed medications. Ms. Gerber counseled her that she was likely to experience symptom exacerbations if she did not take her medications.
19. The symptoms of [Mother's] mental illness included extreme sadness, boundary issues, intense, hostile and dependent relationships with person, isolation from others, distrust of persons who might help her, a cycle of unrealistic valuing and devaluing of people, manipulations of others and screaming outbursts. Her symptoms are exacerbated when she is not medically compliant.
20. [Mother's] symptoms interfere with her day to day functioning. She has had a hard time maintaining employment and suitable residences.
21. Becoming depressed and isolated, failing to maintain healthy relationships, failing to trust people, and failing to utilize available supports and medications, to the extent demonstrated by [Mother], interferes with appropriate parenting of a child and poses a significant risk to the child's healthy emotional development.
22. [Mother] has also in the past been involved in a physically abusive relationship with a boyfriend, which would put a child placed with her at risk.
23. Ms. Gerber provided advocacy and encouragement to [Mother] to help with finding and maintaining appropriate housing. ACES has also been available to provide financial assistance with housing. Despite this assistance, since involvement with ACES, [Mother] has resided in two shelters for brief periods of time, leaving due to conflicts with the facilities and their rules, lived in Transitional Housing at Safe Haven for a brief period of time, lived in a motel room that would not be appropriate for a child due to drug trafficking at the facility, and lived *263 temporarily with various friends. [Mother] then obtained housing at the Blue Triangle, a facility where she has a room but shares a kitchen and bathroom, and which does not allow children. ACES has assisted her with rent payments there.
24. At the time of the March 2003 trial date, [Mother] had remarried and was living in a residence with her husband. She and her husband were married in January of 2003. He is employed, but as of March 2003 [Mother] was not employed.
25. During the course of time she has been involved with ACES, [Mother] has worked at several different jobs for three to six months each, and has also had periods of unemployment. ACES has provided her with some financial assistance for clothes, transportation, and food, although not on a regular basis.
26. [Mother] has been evaluated by Dr. Sato, a psychiatrist with Adult and Child. Symptoms of borderline personality disorder exhibited by [Mother] include labile mood, inconsistency in her presentation, and instability in relationships. She also exhibits diminished self-esteem, sleep problems, feelings of depression and significant anxiety. She demonstrates behavior, thinking, and emotions that are both disturbed and would impact others in a negative disturbing manner. As a result of her psychiatric impairment and failure to consistently follow through with treatment recommendations, it is highly unlikely that she is capable of providing the minimum requirements of a safe, secure and nurturing home environment for [D.D.]. He would be at risk for developing a whole spectrum of psychological, emotional and behavioral problems if left in her care.
27. In order to address her mental health problems, [Mother] needs to be consistent in her compliance with prescribed medications, attend ongoing cognitive therapy on a consistent basis, learn to utilize the resources available to her, and undergo treatment for her substance abuse. [Mother] has not since the time of [D.D.'s] removal demonstrated the ability to consistently follow through with these.
28. Mary Jo Sparke, a therapist with a Master of Social Work in Mental Health, has provided therapeutic visitation to [D.D.] and [Mother]. [D.D.] has been exhibiting anxiety-related behavioral problems at home and in school. During the visitations, [Mother] often placed [D.D.] in an adult role, relying upon him for support and made inappropriate comments. Placing [D.D.] in such an adult role is detrimental in that it places an undue burden on a child's limited capacity at his developmental stage and can cause very confusing emotions, which interfere with his normal development as a child. When [D.D.] sees [Mother], he is prone to anxiety attacks and anger. Such emotions can cause a child to make bad decisions [and] lead to trouble in school, home and the community.
* * * * *
41. The Guardian ad Litem for [D.D.] has been assigned to [D.D.'s] case since April of 2001. She has investigated his case by interviewing Keith Doverspike, the current foster parents, the MCOFC Case *264 Manager, Susan Gerber, and other service providers. She has also visited [D.D.] at the home of Keith Doverspike, at the home of the current foster parents, and at school. She has attended meetings for planning for [D.D.] and attended the entire termination of parental rights trial.
* * * * *
44. The Guardian ad Litem's recommendation for the best interest of [D.D.] is termination of the parental rights of both parents and adoption.
45. [D.D.'s] placement with Keith Doverspike did not work out and Keith asked to have [D.D.] removed, believing he could not provide sufficiently for [D.D.'s] emotional needs.
46. [D.D.] has been placed in his current therapeutic foster home through the Adult and Child Agency since December 5, 2002. He has had some adjustment problems, as could be expected. The involved agencies, which include Adult and Child Mental and the [MCOFC] are working diligently to provide support services for [D.D.] and the foster family so that his needs will be met and the placement can become permanent. The foster family is committed to making [D.D.] a part of their family, and is interested in adoption, although not ready to make a final decision about adoption at this point.
47. The plan of care for [D.D.] if parental rights are terminated is to continue in his therapeutic foster care placement, which supportive services, and for him to be adopted, either by the current foster family or another family.
Appellant's Appendix at 8-13, 17-18. The trial court then found that D.D. had been removed from Mother's care under a dispositional decree for more than six months. The trial court concluded that there was "a reasonable probability, based upon the past pattern of conduct of [Mother], both prior to and during the CHINS case, and her continuing conduct during the course of the termination trial, that the reasons for removal and the reasons for placement outside of [Mother's] home, are likely to continue." Id. at 21. The trial court further concluded that the "continuation of the parent-child relationship between [D.D.] and [Mother] under the circumstances demonstrated by the evidence at trial, poses a threat to his healthy emotional and physical development." Id. at 22. Specifically, the trial court found that despite "the provision of numerous and intensive services to [Mother], she has not demonstrated the ability to consistently follow through with treatment for her mental illness, to maintain employment or an appropriate residence, or to meet [D.D.'s] emotional needs." Id. Lastly, the trial court found that termination of Mother's parental rights was in D.D.'s best interests, and the MCOFC had a suitable plan for D.D.'s future care. Consequently, the trial court ordered that Mother's parental rights to D.D. be terminated.
The sole issue is whether the trial court's order terminating Mother's parental rights to D.D. is clearly erroneous. "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind.Ct.App.1996), trans. denied. However, these parental interests are not absolute and must be subordinated to the child's interests in determining *265 the proper disposition of a petition to terminate parental rights. Id. Parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities. In re L.S., 717 N.E.2d 204, 208 (Ind.Ct.App.1999), reh'g denied, trans. denied, cert. denied, 534 U.S. 1161, 122 S.Ct. 1197, 152 L.Ed.2d 136 (2002). The purpose of terminating parental rights is not to punish parents but to protect children. Id.
When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Doe v. Daviess County Div. of Children & Family Servs., 669 N.E.2d 192, 194 (Ind.Ct.App.1996), trans. denied. We will consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Here, the trial court made findings in granting the termination of Mother's parental rights. Where the trial court has entered findings of fact, we first determine whether the evidence supports the findings. Id. Then, we determine whether the findings support the judgment. Id. The trial court's findings and judgment will be set aside only if they are clearly erroneous. Id. A finding is clearly erroneous when there are no facts or inferences drawn therefrom which support it. In re D.G., 702 N.E.2d 777, 780 (Ind.Ct.App.1998). A judgment is clearly erroneous only if the findings of fact do not support the trial court's conclusions thereon, or the conclusions thereon do not support the judgment. Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind.1996).
Ind.Code § 31-35-2-4(b)(2) (Supp. 2003) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege that:
(A) one (1) of the following exists:
(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
(ii) a court has entered a finding under Ind.Code § 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
(iii) after July 1, 1999, the child has been removed from the parent and has been under the supervision of a county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months;
(B) there is a reasonable probability that:
(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or
(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;
(C) termination is in the best interests of the child; and
(D) there is a satisfactory plan for the care and treatment of the child.
The State must establish these allegations by clear and convincing evidence. Egly v. Blackford County Dep't. of Pub. Welfare, 592 N.E.2d 1232, 1234 (Ind.1992); Doe, 669 N.E.2d at 194.
Mother does not challenge the trial court's finding that D.D. has been removed for more than six months under a dispositional decree. Rather, Mother argues that the following findings by the trial court are clearly erroneous: (1) there was a reasonable probability that the conditions that resulted in D.D.'s removal or the reasons for placement outside of Mother's home *266 would not be remedied;[2] (2) the termination was in D.D.'s best interests; and (3) the MCOFC had a satisfactory plan for the care and treatment of D.D. We address each argument separately.

A.
Mother argues that the trial court erred by concluding that there is a reasonable probability that the reasons for D.D.'s continued placement outside of Mother's home will not be remedied.[3] Specifically, the trial court found that "[t]here is a reasonable probability, based upon the past pattern of conduct of [Mother], both prior to and during the CHINS case, and her continuing conduct during the course of the termination trial, that the ... reasons for placement outside of [Mother's] home, are likely to continue." Appellant's Appendix at 21. Mother argues that the trial court did not take into account evidence of changed conditions that were presented during the termination hearings.
To determine whether a reasonable probability exists that the conditions justifying a child's continued placement outside the home will not be remedied, the trial court must judge a parent's fitness to care for her children at the time of the termination hearing and take into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind.Ct. App.2001), trans. denied. However, the trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id.
Mother's alleged changed conditions included her recent marriage, residence in a two-bedroom apartment, weekly visits with a counselor, biweekly visits with a therapist, compliance with her medication, participation in a parenting program, attendance at four Narcotics Anonymous meetings each week, participation in Sober Life meetings, and enrollment in classes to be a social worker. However, these alleged changed conditions are based solely upon the testimony of Mother and her current husband. Mother introduced no additional documentation or other evidence in support of these changed conditions. *267 On the other hand, the guardian ad litem testified that she had asked Mother for releases and information on the services that she was completing but that she never received the information from Mother. Further, the MCOFC introduced evidence that Mother had tested positive for marijuana use as late as January 2003, four months before the judgment was entered.
The trial court was permitted to judge Mother's and her husband's credibility and weigh their testimony against the significant testimony demonstrating Mother's habitual patterns of conduct in failing to address her mental health problems, be consistent in taking her medication, address her addiction problems, and provide a safe consistent nurturing residence and environment for D.D.[4] On appeal, we cannot reweigh the evidence or judge the credibility of the witnesses. We cannot say that the trial court's finding that Mother's habitual pattern of conduct indicates that there is a reasonable probability that reasons for D.D.'s continued placement outside of Mother's home are likely to continue is clearly erroneous. See, e.g., In re D.J., 755 N.E.2d 679, 685 (Ind.Ct.App. 2001) (holding that the mother's pattern of conduct both before and during the termination proceedings supported the trial court's determination that the conditions that resulted in removal would not be remedied), reh'g denied, trans. denied.

B.
Mother also argues that the trial court's finding that termination was in D.D.'s best interests is clearly erroneous. In determining what is in the best interests of the children, the trial court is required to look at the totality of the evidence. A.F. v. Marion County Office of Family & Children, 762 N.E.2d 1244, 1253 (Ind.Ct.App.2002), trans. denied. In doing so, the trial court must subordinate the interests of the parents to those of the children involved. Id.
Here, the evidence demonstrated that Mother has a history of substance abuse and a number of mental health problems. Despite extensive services offered to Mother since D.D. was removed in late 2000, including substance abuse treatment, psychiatric evaluations, psychiatric care, medications, counseling, housing, and financial assistance, Mother failed to adequately demonstrate a change in the conditions that necessitated D.D.'s continued removal. Moreover, during therapeutic visitations between D.D. and Mother, D.D.'s counselor had concerns that Mother placed D.D. in an adult role and made inappropriate comments in front of D.D. Further, the guardian ad litem assigned to this case since April 2001 recommended that termination of Mother's parental rights was in D.D.'s best interests. Based upon the totality of the evidence, we cannot say that the trial court's finding that termination was in D.D.'s best interest was clearly erroneous. See, e.g., id. (holding that the trial court's conclusion that termination would be in the best interests of the children was not clearly erroneous), trans. denied.

*268 C.
Lastly, Mother argues that the trial court's finding that the MCOFC has a suitable plan for D.D.'s care is clearly erroneous. In order for the trial court to terminate the parent-child relationship the trial court must find that there is a satisfactory plan for the care and treatment of the child. In re B.D.J., 728 N.E.2d 195, 204 (Ind.Ct.App.2000). This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. Id. Here, D.D. was residing in a foster home, and the foster parents were interested in adoption but were not ready to make a final decision. The MCOFC's plan was for D.D. to be adopted, either by the current foster family or another family. The MCOFC offered a plan that gave a general sense of direction for D.D.'s care and treatment. The trial court's finding that the MCOFC has a suitable plan for D.D.'s future care is not clearly erroneous. See, e.g., id. (holding that "sufficient evidence exists supporting the trial court's conclusion that a satisfactory plan exists for the care and treatment of the children").
For the foregoing reasons, we affirm the trial court's termination of Mother's parental rights to D.D.
Affirmed.
BAKER, J., concurs.
BROOK, C.J., dissents with separate opinion.
BROOK, Chief Judge, dissenting.
The trial court failed to take into consideration overwhelming evidence of Mother's changed circumstances by the time of the final hearing. Accordingly, I respectfully dissent from the Majority's decision to affirm the termination of Mother's parental rights.
To determine whether there is a reasonable probability that the conditions which resulted in a child's removal or continued placement outside of the home will be remedied, the trial court should judge a parent's fitness to care for her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re D.J., 755 N.E.2d 679, 684 (Ind.Ct.App.2001), trans. denied. A termination of parental rights cannot be based entirely upon conditions which existed in the past, but which no longer exist. In re Termination of Parent-Child Relationship Between Children: T.C., and Parents: P.C., 630 N.E.2d 1368, 1374 (Ind. Ct.App.1994), trans. denied. My review of the record reveals, however, that the trial court did just that.
It is clear from the record that the MCOFC witnesses' involvement with Mother was severely limited in duration, and was too remote in time to accurately reflect Mother's parental fitness as of the date of the final hearing in March of 2003. For example, Leesa Franklin, MCOFC home-based counselor, testified that at the time she closed her case, she had significant concerns regarding Mother's ability to safely provide for D.D. due to Mother's lack of consistency in taking her medications, her lack of stable residency and employment, and her emotional instability. This testimony is directly reflected in the trial court's finding number fourteen. The record reveals, however, that Franklin only worked with Mother for three months, beginning in December of 2000, and ending in February of 2001, at the commencement of the CHINS proceedings. Additionally, Franklin testified that she had no knowledge of Mother's current situation. Thus, the trial court's finding number fourteen, while technically accurate for the three months Franklin was involved in the case, is misleading in that it *269 does not reflect an accurate assessment of Mother's fitness as of the time of the final hearing in March of 2003.
Likewise, Susan Gerber, resource coordinator for the Action Coalition to Ensure Stability ("ACES"), also testified on behalf of MCOFC. Her testimony is directly reflected in the trial court's findings numbers fifteen, nineteen, twenty, twenty-one, twenty-five, and twenty-seven. Gerber's testimony, however, reveals that her contact with Mother began in February 2001, and ended in July of 2002, one full year before the final termination hearing. Moreover, when Gerber testified on August 5, 2002, she stated that the last time she had spoken to Mother was thirty days earlier, and that at that time, Mother had reported that she was working with mental health services and taking her medication as prescribed.
Finding number nine indicates that Mother was diagnosed with borderline personality disorder. Findings twenty-six and twenty-seven discuss in detail the symptoms of borderline personality disorder and other "disturbing" behaviors Mother demonstrates. The language of these findings is taken practically verbatim from Dr. Takuyo Sato's testimony. Tr. at 213-14, 218-19. My review of the record, however, reveals that these findings mischaracterize Dr. Sato's testimony.
Dr. Sato testified that, in light of Mother's history and presentation during the interview, she met the criteria for borderline personality disorder. He further explained, however, that this meant that he was left with a "diagnostic impression" or "initial evaluation" that Mother exhibited symptoms, which met the criteria for borderline personality disorder. Tr. at 213. Dr. Sato also admitted that his involvement with Mother consisted solely of one psychiatric evaluation conducted during two fifty-minute sessions held on March 8th and April 5th of 2002, approximately one year before the final hearing. Dr. Sato further testified that Mother did not complete any type of psychological testing, that he was not asked to make a treatment recommendation for Mother, and that he had never met with D.D. Tr. at 223.
Other than finding number twenty-four, in which the trial court acknowledges that Mother had remarried and was living with her husband, the trial court's termination order is completely silent with regard to the uncontroverted evidence of Mother's remediation of the conditions which led to D.D.'s placement outside her care and custody. This solitary finding by the trial court ignores the fact that as of the March 2003 final hearing, Mother had remedied every reason cited by the trial court for D.D.'s continued removal from her care.
Mother was not only married and living in a two-bedroom residence with her husband, but she had been seeing a counselor once a week for the previous six to seven weeks, and had seen another therapist every two weeks for a year prior to that. Tr. at 487-88. Also, at the time of the final hearing, the uncontroverted evidence reveals that Mother, who suffers from depression and anxiety, was taking her medication as prescribed, was involved in a parenting program called Solo Flight, attended four meetings a week at Narcotics Anonymous for Dual Diagnoses, participated in Sober Life meetings for former addicts, and was taking classes to become a social worker. Tr. at 490-91, 505.
Mother's husband, Steven Daniels, also testified. Daniels verified that he had observed Mother taking her medications as directed. Additionally, Daniels provided undisputed evidence that he was gainfully employed, attended many of the weekly Narcotics Anonymous meetings with Mother as a show of support, provided financial support for Mother, had met D.D. *270 and was willing to financially support him, and was willing to go to family therapy and parenting classes to help D.D. adjust to his new life should Mother regain custody of D.D. Tr. at 501-10. Based on the foregoing, it seems obvious that the trial court failed to consider Mother's parental fitness as of the date of the final termination hearing.
The Majority discounts this overwhelming evidence of changed circumstances stating, "these alleged changed conditions are based solely upon the testimony of Mother and her current husband. Mother introduced no additional documentation or other evidence in support of these changed conditions." Op. at 266. I find this decision, to ignore the testimony of two witnesses who have sworn an oath to tell the whole truth in a court of law simply because there is no additional corroborating evidence, troubling.
While a trial court is certainly permitted to make judgment calls when evaluating the credibility of witnesses, the fact that a witness may have a motive to lie does not automatically render his or her testimony unreliable. See Brasher v. State, 746 N.E.2d 71, 73 (Ind.2001) (stating that it was within the jury's province to find the witness's testimony credible even though the witness had a motive to lie). Similarly, we routinely uphold criminal convictions based on the self-serving testimony of a single eyewitness. See Parmley v. State, 699 N.E.2d 288, 291 (Ind.Ct.App.1998) (affirming a conviction for child molesting based solely on the uncorroborated testimony of the victim), trans. denied; see also Hubbard v. State, 719 N.E.2d 1219,1220 (Ind.1999) (holding that the uncorroborated testimony of the victim was sufficient to sustain the defendant's convictions for murder, attempted murder, robbery and confinement).
Here, both Mother and her husband swore an oath to tell the truth before testifying about Mother's current housing, medication compliance, counseling and educational endeavors. The MCOFC failed to present any evidence contradicting this testimony. Moreover, most of the "damning" evidence pertaining to Mother's former drug use, medicinal non-compliance, housing and employment failures which MCOFC caseworkers and counselors relied upon, was freely revealed to them by Mother herself. It seems inconsistent to me that the Majority is willing to accept as true testimony based on Mother's unsworn self-reports to counselors and caseworkers, while at the same time automatically dismiss the reliability of Mother's own sworn testimony in a court of law.
The Majority claims:
The trial court was permitted to judge Mother's and her husband's credibility and weigh their testimony against the significant testimony demonstrating Mother's habitual patterns of conduct in failing to address her mental health problems, be consistent in taking her medication, address her addiction problems, and provide a safe and consistent nurturing residence and environment for D.D.
Op. at 267. It is true that, when judging a parent's fitness, the trial court should examine the parent's habitual patterns of conduct, as well as the parent's fitness at the time of the termination hearing, to determine whether there is a substantial probability of future neglect or deprivation of the child. See In re D.G., 702 N.E.2d 777, 779 (Ind.Ct.App.1998). However, the Majority seems to limit its view of what constitutes Mother's habitual pattern of conduct.
Granted, for many months following the initiation of the CHINS proceedings, Mother was often non-compliant with MCOFC's mental health treatment, employment, and housing rules. However, *271 the record contains undisputed evidence that before MCOFC's involvement in October of 2000, Mother was the primary caregiver to D.D. and her other two children. Unchallenged testimony from Mother and various other witnesses, including D.D.'s biological father, paternal grandmother, MCOFC caseworker Leesa Franklin, and the juvenile court's own home assessment[5] further shows that for the first seven years of D.D.'s life, Mother was a caring and affectionate mother. For seven years, Peterson provided D.D. with adequate food, good hygiene, a clean home, proper clothing, appropriate medical care, and love and affection, despite her mental afflictions. This evidence of Peterson's habitual past conduct, combined with the undisputed evidence of Peterson's changed conditions as of the final hearing in March of 2003, undermines the Majority's conclusion that Mother's habitual pattern of conduct supports a finding that the reasons for D.D.'s continued placement outside of Peterson's home are likely to continue and that the continuation of the parent-child relationship poses a threat to D.D.'s well-being.[6]
Finally, I cannot accept the Majority's ultimate conclusion that this Court "cannot say that the trial court's finding that Mother's habitual pattern of conduct indicates that there is a reasonable probability that reasons for D.D.'s continued placement outside of Mother's home are likely to continue is clearly erroneous." Op. at 267. Admittedly, significant evidence indicates that Mother was not a perfect person, or a perfect mother. Perfection, however, is not required of a parent before termination of the parent-child relationship. In re T.C. and P.C., 630 N.E.2d at 1374.
By the time of the final hearing, Mother's circumstances had changed dramatically. Additionally, the specific reasons for D.D.'s continued placement outside the home, namely, Mother's prior misuse of prescription drugs, her mental illness and erratic behavior, her failure to follow through with mental health treatment, and her inability to provide a safe and consistent nurturing residence for D.D., had all been addressed. Likewise, the perceived *272 threat to D.D.'s emotional well being due to Mother's prior medicinal non-compliance was also remedied. This Court has previously stated, and I believe, that "it would be useless and wasteful to provide a process by which a parent could work toward reunion with a child, if ... the basis for termination is the events surrounding the child's initial removal." Id. at 1375.
Our supreme court has explained that termination of parental rights is the exception rather than the rule, in that "[c]hildren are not taken from ... their parents because there is a better place for them [but rather] because ... the custody of their parents is wholly inadequate for their very survival." Matter of Miedl, 425 N.E.2d 137, 141 (Ind.1981); see also Carrera v. Allen County Office of Family and Children, 758 N.E.2d 592, 595 (Ind.Ct.App. 2001). Moreover, this Court will reverse a trial court's order terminating a parent-child relationship upon a showing of "clear error"that which leaves us with a definite and firm conviction that a mistake has been made. Egly v. Blackford County Dep't of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind.1992).
A thorough review of the record in this case leaves me convinced that a mistake has indeed been made. While there may have been sufficient evidence to support the termination of Mother's parental rights when the termination petition was originally filed, it is clear that the trial court completely disregarded the uncontroverted evidence of Mother's dramatic change in circumstances as of the date of the final termination hearing. It is for this reason that I would reverse the trial court's termination of Mother's parental rights to D.D. and reunite this child with his Mother.
NOTES
[1] Troy Delozier is D.D.'s father. The trial court terminated Delozier's parental rights to D.D., and Delozier does not appeal that determination.
[2] Mother also argues that the trial court's finding that the continuation of Mother's parental relationship poses a threat to D.D. is clearly erroneous. Ind.Code § 31-35-2-4(b)(2) required the MCOFC to demonstrate by clear and convincing evidence a reasonable probability that either: (1) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied, or (2) the continuation of the parent-child relationship poses a threat to the well-being of the child. The trial court specifically found that there was a reasonable probability that the conditions that resulted in D.D.'s continued placement outside Mother's home would not be remedied, and this finding is not clearly erroneous. See infra Part A. Consequently, we need not address Mother's argument regarding the finding that her parental relationship poses a threat to D.D. See, e.g., In re T.F., 743 N.E.2d 766, 774 (Ind.Ct.App.2001), trans. denied.
[3] Mother also argues that the trial court's finding that the reasons for D.D.'s removal were likely to continue is clearly erroneous. Specifically, Mother argues that D.D. was removed because of abuse by Doverspike and that situation was apparently remedied. While we agree that the evidence does not support a finding that the reasons for D.D.'s removal were likely to continue, the statute requires a finding that a reasonable probability exists "that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied." Ind.Code § 31-35-2-4 (emphasis added). The trial court also found a reasonable probability that the reasons for continued placement outside of Mother's home would not be remedied, and this finding is not clearly erroneous. See infra Part A.
[4] The dissent argues that these habitual patterns of conduct are outweighed in part because Mother "provided D.D. with adequate food, good hygiene, a clean home, proper clothing, appropriate medical care, and love and affection, despite her mental afflictions" for seven years prior to D.D.'s removal. Dissent at 7. However, the evidence also indicates that between April 1999 and December 2000 Doverspike would sometimes come home to Mother "passed out on the couch" because of the drugs that she was taking, leaving the Children with no supervision and the house a "mess." Transcript at 378. Mother also attempted to commit suicide in the kitchen while the Children were sleeping in the residence.
[5] A parenting assessment conducted on August 24 and 31, 2000, and admitted during the termination hearing stated that Mother was "bonded, nurturing, appropriate and comfortable with her children. The children also appeared bonded and comfortable with [Mother]." Respondent Mother's Ex. # 79 at 86. The report also indicated that the home was clean and appeared safe and appropriate for the family. Respondent Mother's Ex. # 70 at 80.
[6] The Majority, in discounting Mother's habitual pattern of conduct as a caring and affectionate mother prior to MCOFC's involvement, points to testimony given by Delozier, Mother's former live-in boyfriend who was fighting her for custody of D.D. See op. at 267 n. 4. What is not clear from the Majority's recount of this testimony, however, is that Mother's alleged suicide attempt occurred in December of 2000, after MCOFC was already involved in the case, and during the time when Delozier, under the direction of MCOFC, was evicting Mother from her home. Tr. at 380, 382. Thus, it does not negate Mother's parenting performance prior to MCOFC's involvement. Additionally, the transcript is silent as to when, during the period of April 1999 through December 2000, Delozier observed Mother passed out on the couch. Tr. at 378. Obviously, sometime before MCOFC's involvement, Mother's ability to properly care for D.D. was compromised. Otherwise, MCOFC would never have remained involved. However, as stated earlier, there was significant testimony from several witnesses, including one of MCOFC's own caseworkers, that for the majority of D.D.'s life prior to MCOFC's involvement in 2000, Mother had been a nurturing and caring parent who was appropriately bonded with her son. This evidence, coupled with Mother's dramatic change of circumstances by the time of the final hearing, in my opinion, necessitates a finding that the trial court erred in terminating Mother's parental rights to D.D.