In the Matter of A.J., E.J., and J.J., Children in Need of Services.

Marlos and Maya J., Appellants–Respondents,

v.

Marion County Department of Child Services, Appellee–Petitioner,

and

Child Advocates, Inc., Appellee–Guardian Ad Litem.

No. 49A02–0703–JV–271.

Court of Appeals of Indiana.

Dec. 10, 2007.

---

Katherine A. Cornelius, Marion County Public Defender Agency, Appellate Division, Indianapolis, IN, Attorney for Appellant, Marlos J.

Anna E. Onaitis, Marion County Public Defender Agency, Appellate Division, Indianapolis, IN, Attorney for Appellant. Maya J.

Elizabeth G. Filipow, Indianapolis, IN, Attorney for Appellee, Marion County Department of Child Services.

## OPINION

CRONE, Judge.

### Case Summary

Marlos J. ("Father") and Maya J. ("Mother") (collectively, "the parents") appeal the termination of their parental rights. We affirm.

### Issues

Father and Mother raise the following restated issues on appeal:

I. Whether the trial court erred in allowing testimony regarding a polygraph examination; and

II. Whether the trial court's order terminating Mother's and Father's parental rights to A.J., E.J., and J.J. is clearly erroneous.

### Facts and Procedural History

A.J., E.J., and J.J. are the biological children of Mother and Father. In 2004, Mother began experiencing mental health issues relating to depression and anxiety. In April or May of 2004, Mother took the children from the home because she thought Father had done something to the children, and was hospitalized for five days. In January of 2005, Mother again removed A.J., E.J., and J.J. from the home where she had been living with Father because she was "afraid" of Father. Tr. at 365–66. Mother initially resided with the children in a Days Inn hotel, but was later admitted to the Community North Hospital psychiatric unit for approximately one week, and was placed on medications.

On January 4, 2005, the Marion County Department of Child Services ("MCDCS") filed a petition alleging A.J., E.J. and J.J. to be children in need of services

("CHINS"). The petition alleged the children were CHINS for several reasons, including the fact that Mother was residing at the Community North Stress Center and was in need of mental health treatment, and because there was a concern that the children had been sexually molested by their father.

On January 5, 2005, the trial court ordered that the children be made wards of the MCDCS and further ordered that they reside either at the Guardian Home, or in relative or foster care. On March 22, 2005, Mother and Father each entered into an Agreed Entry with the MCDCS in which each parent admitted that A.J., E.J., and J.J. were CHINS. Mother and Father also agreed to have the Agreed Entry serve as the court's own Parental Participation Decree, and that the Dispositional Hearing in this matter be held concurrently with the trial court's consideration and approval of the Agreed Entry.

By virtue of the trial court's Dispositional Order, the children were then ordered removed from both Mother's and Father's care effective immediately. The trial court delineated specific requirements for reunification including, among other things, that Mother and Father actively participate in and successfully complete specific services, as well as follow all recommendations made by the therapists and counselors. The services ordered by the court included a parenting assessment, mental health treatment, and home-based counseling for Mother. Father was ordered to participate in a parenting assessment, a specific parenting class for parents of children who have been sexually molested by an unknown offender, and home-based counseling.

On April 18, 2006, the MCDCS filed its petition for involuntary termination of the parent-child relationship as to both Mother and Father. On November 1, 2006, and November 29, 2006, the trial court held a child hearsay hearing to determine whether A.J. would be required to testify at the termination hearing in this matter. On January 19, 2007, the trial court entered an order allowing the admission of statements made by A.J. in the November 1, 2006, and November 29, 2006 hearings, and incorporated said testimony into the trial on the termination petition in this matter pursuant to the stipulation of counsel.

On January 30, 2007, the trial court held a fact finding hearing and subsequently issued its order terminating the J.s' parental rights to all three children. In so doing, the trial court made the following relevant findings of fact and conclusions of law:

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT ENTRY

. . . .

5. Gretchen Cottrell, earned a Masters Degree in Social Work in 1998, and has counseled children regarding sexual abuse for the last 7 1/2 years at Family Growth Center, a facility that works with children and families where child sexual abuse has occurred. She has received extensive training in the field of sexual abuse and undergoes continuing education and training in the field.

Gretchen Cottrell has provided therapy to [A.J.] regularly since her first therapy session with [A.J.] on Feb. 2, 2005, when [A.J.] was nearly 5 years of age. Cottrell used play therapy and expressive therapy with [A.J.], which are types of therapy accepted and utilized in her field with young children, and which allow the children to express themselves and work through issues by play and expression through art.

. . . .

9. [A.J.] has exhibited behaviors consistent with children who have suffered sexual abuse, including signs of depression, nightmares, problems with bathroom use, public masturbation, ambivalence to parents, and urinating and defecating on herself.

. . . .

12. On May 10, 2005[,] [A.J.] used anatomically correct play dolls she referred to as Marco and [A.J.]. She had the Marco doll touch the [A.J.] doll on the chest, referring to that as her "boobies" and had the Marco doll's hand rub [the A.J.'s] doll's private area, stating "he did this . . . he touched my private" "a lot[.]" [A.J.] referred to the Marco doll's penis as "his winkie" and put the Marco doll's penis into the [A.J.]'s doll's vagina, stating "Marco he did this to me too. [Mother] saw it and he was in trouble. I got a whooping for it, too."

. . . .

14. Ron D. Smith[,] M.S., LHMC, CADACI, holds a masters degree in counseling[,] has fifteen years experience working with adult and adolescent sexual abusers, is an approved Sex Offender Treatment Provider in Marion County, Indiana, is a Certified Sex Therapist [sic] the American Colleges of Counselors, and has been Director of the Indianapolis Counseling Center in Indianapolis[,] Indiana[,] since December of 1999 to the present. At Indianapolis Counseling Center, he provides psychosexual evaluations, and specialized sex offender therapy in group and individual settings.

15. On June 9, 2005[,] Ron Smith conducted separate psychosexual assessments on both [Father] and [Mother]. As a result of his evaluation, Ron Smith recommended that [Father] receive a polygraph evaluation by a certified sex offender evaluator on the sexual abuse allegations against [Father], and that if deception were found or [Father] admitted sexual abuse that he should obtain specialized sex offender therapy to address his sexual maladaptive behaviors.

14. As a result of his psychosexual evaluation of [Mother], it was Ron Smith's clinical opinion that she might have a personality disorder. This was based upon her past history of diagnosis and medication and his observations of her mental status and mood swings. He recommended that she obtain ongoing therapy to address and [sic] personality disorders, that she receive a polygraph evaluation by a certified sex offender evaluator regarding her knowledge of the sexual abuse allegations against [Father], and that if deception were found or [Mother] admitted knowledge or involvement in the sexual abuse that she should obtain specialized sex offender therapy.

17. The use of polygraph evaluations performed by certified sex offender evaluators is accepted and widely utilized by clinicians within the field of assessment and treatment of sexual offenders. There is research and evidence to support the reliability of this instrument as a treatment tool in this field. It is a tool used to help break down denial by offenders and to act as a deterrent for prevention of further acts of sex abuse. Polygraph evaluation is used by the Indianapolis Counseling Center; however, the polygraphs are performed by outside certified sex offender evaluators in order to avoid a conflict of interest.

. . . .

19. Both [Father] and [Mother] underwent polygraph examinations by a certified sex offender evaluator at Broad Ripple Counseling. The results were provided to and reviewed by Ron Smith who continued to recommend that both

[Father] and [Mother] attend specialized sex offender therapy.

. . . .

31. Sexual abuse of a child is very traumatic, detrimental to the child's well-being, and can cause dysfunctional behaviors and emotions in the child, including nightmares, ambivalence towards or fear of the offending parent, depression, and public masturbation. This Court finds that this child is terrified of ever going back to these parents. The Court finds the testimony credible that Father molested this child and that Mother failed to protect her or prevent it.

. . . .

36. Throughout the case [Mother] has exhibited symptoms and behaviors consistent with mental health issues, as documented by professionals and casemanagers [sic], which have interfered with her ability to access and benefit from services designed to help her parent and protect her children. Additionally, the reason for the initial removal of the children was in part due to a serious mental health breakdown of the mother, which caused her to take the children, leave her husband, and then to be psychiatrically hospitalized. [Mother] has stated that she believed that [Father] was molesting her children and then alternatively denied that molestation was occurring. [Mother] testified that during times of the marriage, she was afraid of [Father], thought that he had done something to the children and didn't trust him with the children. She thought that he was in a cult, involved with witchcraft and that he was acting very strange. She says he was abusive mentally to her. Mother stated that her diagnosis at Wishard was a psychosis, and that she was bi-polar. [Mother] presented no evidence from a professional psychiatrist, psychologist, or psy-

chiatric social worker that she had received any consistent mental health treatment since this event, that she had progressed in mental therapy, that she was taking psychiatric medications to help her symptoms, or that her mental health condition had been treated sufficiently that she was capable of caring for and protecting her children from sexual abuse. [Mother] herself denied that she had mental health issues or that she needed medication at the time of trial. [Mother] also was unable to meet with and have a meaningful conversation with Case Manager Debra Mullins regarding the status of the case, her mental health treatment and services which the MCDCS may have been able to provide to help [Mother].

. . . .

38. Despite referrals made after the April 18, 2006 Court order, for sex offender treatment at Broad Ripple Counseling and then at Indianapolis Counseling Center, [Father] did not complete sex offender treatment at either agency.

. . . .

40. Dr. Mary Papandria is a licensed clinical psychologist in the State of Indiana, earned a Masters Degree in Rehabilitative Psychology in 1985 and a Doctorate in Psychology in 1993, has practiced extensively in the field of psychology, and has performed psychological assessments of adults and children on a regular basis.

41. Dr. Mary Papandria performed a psychological evaluation on the minor child [A.J.] on September 20, 2006. It was Dr. Papandria's expert opinion that [A.J.] was demonstrating behaviors of a child that had been traumatized. In fact, this psychologist found what she considered to be potential markers for psychosis if the child is not provided ongoing treatment and therapy and if the

stressors remain. At the time of the assessment, [A.J.] was not psychotic or exhibiting delusional behavior. However, she did at times exhibit what Papandria termed "checking out into daydreams for coping."

42. Based upon the therapeutic nature of the setting in which [A.J.]'s statements were made, the non-leading therapeutic techniques used in Cottrell's therapy including use of anatomically correct dolls and play phones to act out [A.J.]'s feelings and expressions, the detailed nature of the statements, [A.J.]'s young age such that she would not normally be aware of details of sexual behavior, the fact that [A.J.] expressed love for her parents and desired a sense of permanency but never recanted any of her statements regarding the sexual abuse, the detailed and graphic nature of the statement, the spontaneous nature of many of the statements, the reliable record-keeping of Cottrell, and the symptoms exhibited by [A.J.] consistent with children who have suffered sexual abuse, the Court finds that the time, content, and circumstances of the statements, along with other evidence described herein, provide sufficient indications of reliability regarding the out of court statements made by [A.J.] as delineated in this Court's order of January 19, 2007, and which have been introduced as evidence in this proceeding.

43. Based upon [A.J.]'s statements regarding sexual abuse, the behaviors she has exhibited consistent with a victim of sexual abuse, the counseling and assessments provided by Gretchen Cottrell and Dr. Mary Papandria, the court finds by clear and convincing evidence that [A.J.] has been sexually abused by her father ... and that her mother ... failed to protect [A.J.] from sexual abuse.

44. Based upon the continued denial of [Father] and his failure to complete any sex offender therapy, there is a significant risk that [A.J.], and her siblings, would be at risk for sexual abuse if placed with [Father].

45. Based upon her continued denial of the abuse, her failure to complete any sex offender therapy, or the program at Indianapolis Counseling Center, her continued defensiveness, outbursts, and other symptoms associated with mental illness, and her failure to demonstrate participation in and benefit from mental health treatment, there is a significant risk that [A.J.] and her siblings, would be at risk for sexual abuse if reunited with [Father] and [Mother] together, and at risk for abuse or neglect if reunited with [Mother] separately.

46. None of the three children have been returned to the care and custody of either of their parents since the removal under the CHINS case.

47. [E.J.] has been diagnosed with autism, is nonverbal and requires constant supervision for his safety. He does not feed or bathe himself. He has exhibited adjustment behaviors particularly around visitation; including fecal smearing, bed wetting, biting, hitting, sexual self-stimulation, increased defiance [and] kicking. [E.J.]'s supervising visitation person, Jason Hayes, recommended to the Juvenile Court that visits be suspended ... between this child and both [Mother] and [Father] in July 2006. He is doing well in his current foster home, where the parents are well able to meet his special needs. This family had been providing occupational therapy, physical therapy, providing adaptive equipment and taking him for sensory group training. His current foster parents wish to adopt him if he is free for adoption.

48. [A.J.] and [J.J.] each exhibit special behavioral needs, especially [A.J.] who has been severely traumatized by her past. [J.J.] has been diagnosed with a mild form of Cerebral Palsy and has displayed severe tantrums, inducing vomiting, scratching himself, and biting himself. He has also recently undergone a neurological evaluation to rule out autism. Both children have recently been moved into an experienced therapeutic foster home which is potentially preadoptive, meaning the family is considering adoption of the children after they have been placed there for a longer period of time. The children are doing well in this home where the foster family is able to meet their special needs.

49. The Guardian ad Litem assigned to this case, Alexis Nicholson, working under the supervision of Carolyn Thurston from Child Advocates, has investigated the situation by reviewing information, interviewing the foster parents, and visiting the children in the foster homes. Her recommendation for the plan in the best interest of the children is termination of parental rights and adoption.

50. The MCDCS has resources available to find adoptive homes for [A.J.] and [J.J.] should the family with whom they are currently placed decide not to adopt.

51. There is a reasonable probability that the reasons for removal and continued placement of the children out of the home of [Mother], that is her mental health issues, neglect and endangerment to the children, are not likely to be remedied.

52. There is a reasonable probability that the reasons for removal and continued placement of the children out of the home of their father ... that is sexual abuse and risk of further sexual abuse, are not likely to be remedied.

53. These children need a sense of permanency and stability in their lives and to be provided with an environment in which to grow up that is free from the risk of abuse or neglect.

54. There is a reasonable probability that continuation of the parent-child relationship between the three children and their mother ... poses a threat to the well-being of the children.

55. There is a reasonable probability that continuation of the parent-child relationship between the three children and their father ... poses a threat to the well-being of the children.

. . . .

57. The plan of the [MCDCS] for the care of the children if parental rights are terminated, adoption, is satisfactory. The Court does not take any termination proceeding lightly, nor find automatically that simply by the filing of a termination proceeding, the result should be termination of parental rights. Rather, this Court evaluates all of the evidence, the testimony of each witness, the credibility of each witness and the totality of the circumstances in making a decision on termination of any parent's right to raise their children.

. . . .

### CONCLUSIONS OF LAW

1. [A.J.], [E.J.], and [J.J.] ("the children") were found to be Children in Need of Services by Order of the Marion Superior Court, Juvenile Division.

2. The children have been removed from their mother ... and their father ... under the terms of a dispositional decree for more than six months.

3. There is a reasonable probability that the conditions that resulted in the children's removal from and continued

placement outside the care and custody of the mother ... will not be remedied.

4. There is a reasonable probability that the continuation of the parent-child relationship between the children and their mother ... poses a threat to the well-being of each child.

5. There is a reasonable probably that the conditions that resulted in the children's removal from and continued placement outside the care and custody of the father ... will not be remedied.

6. There is a reasonable probability that the continuation of the parent-child relationship between the children and their father ... poses a threat to the well-being of each child.

7. Termination of the parent-child relationship between each of the children and their mother ... is in the child's best interest.

8. Termination of the parent-child relationship between each of the children and their father ... is in the child's best interest.

9. The plan of the [MCDCS] for the care and treatment of each of the children if the parent-child relationship is terminated is adoption and that plan is acceptable and satisfactory.

Appellant's App. at 13–24. This appeal ensued. Additional facts will be supplied as necessary.

### Discussion and Decision

### I. Whether Admission of Polygraph Testimony Constitutes Reversible Error

The parents first assert that the trial court "erred and significantly prejudiced both [Mother] and [Father] by admitting testimony from which the results of their polygraph examinations could be inferred,

despite the trial court's acknowledgment that such results are inadmissible." Appellant's Br. at 5.

The record reveals that during MCDCS Case Manager Tonya Shaul's testimony, Shaul, who was testifying regarding the services to which Father and Mother had been referred, stated, "Both parents failed that polygraph." Tr. at 224. Father's counsel immediately objected and moved to strike, and the trial court granted Father's motion.

Father and Mother correctly point out that polygraph examinations are generally inadmissible, absent a valid stipulation between the parties. *See Harris v. State*, 481 N.E.2d 382, 384 (Ind.1985). Thus, the trial court properly granted Father's motion to strike Shaul's statement regarding the polygraph results. The parents complain, however, that "[d]espite the trial court's willingness to immediately strike Shaul's statement, it readily admitted [Dr. Ron Smith's [1]] statements supporting a strong inference that [Father] and [Mother's] polygraph examination results were not favorable[,]" thereby resulting in prejudice. Appellant's Br. at 6.

 The admission of evidence is entrusted to the sound discretion of the trial court. *In re Paternity of P.W.J.*, 846 N.E.2d 752, 757 (Ind.Ct.App.2006). We will find an abuse of discretion only where the trial court's decision is against the logic and effect of the facts and circumstances before the court. *Id.* The fact that evidence was erroneously admitted does not automatically require reversal, and we will reverse only if we conclude the admission affected a party's substantial rights. *In re Paternity of H.R.M.*, 864 N.E.2d 442, 445 (Ind.Ct.App.2007).

---

1. We note that because there are two expert witnesses in this case named "Dr. Smith," we will use Dr. Ron Smith's full name throughout this opinion.

■ Here, Dr. Ron Smith did not testify as to the specific results of the parent's polygraph examinations. However, he did testify as to his recommendations for treatment, which were based, in part, upon his review of the polygraph results. Indiana Evidence Rule 703 provides that "[e]xperts may testify to opinions based on *inadmissible* evidence, provided that it is the type reasonably relied upon by experts in the field." *See Vaughn v. Daniels Co. (West Virginia), Inc.*, 841 N.E.2d 1133, 1137 (Ind.2006) (citing Ind. Evid. Rule 703) (emphasis added). Thus, the admissibility of Dr. Ron Smith's polygraph testimony hinges on whether the use of polygraph examinations in the field of sexual abuse treatment is reasonably relied upon by experts in the field.

When asked at trial if the use of polygraphs as a treatment tool is accepted in his field, Dr. Ron Smith responded, "Very much so." Tr. at 168. He went on to explain that when working with those who have committed sex crimes, the polygraph is "primarily used for treatment purposes[,]" and that it also serves as a "deterrent for offenders to commit further crimes" when used for maintenance and monitoring purposes as well. *Id.* Dr. Ron Smith further testified that "[t]he literature supports the use of polygraph for treatment purposes" and that such use has had a "dramatic impact" for providers in the formulation of treatment plans specifically designed for the offender because the more honest a person is about their sexual history, the more aware the therapist is in identifying patterns of deviant sexual behaviors. *Id.* at 168–69.

Based on the foregoing, we conclude that the trial court did not err in allowing Dr. Ron Smith to testify as to his recommendations for treatment which were based, in part, on the polygraph results. While polygraph results are normally inad-

missible absent a valid waiver by both parties, here, the results were not specifically reported. Moreover, the MCDCS laid a proper foundation demonstrating that the use of polygraph examinations, for the purposes of assessment and treatment, is reasonably relied upon by experts in the field of sexual abuse treatment. Father and Mother insist, however, that Dr. Ron Smith's testimony allowed the trial court to make an impermissible inference that they failed the polygraph, in order to establish that A.J. was molested by Father and that Mother failed to protect A.J.

■ In bench trials, it is generally presumed that the trial judge disregards inadmissible evidence and renders its decision solely on the basis of relative and probative evidence. *Berry v. State*, 725 N.E.2d 939, 943 (Ind.Ct.App.2000). Likewise, it is presumed that evidence, which might be inadmissible and prejudicial when placed before a jury, is disregarded by the court when making its decision, *unless* the defendant presents evidence to the contrary. *Id.* (emphasis added). In fact, we have previously held that "[a]ny harm from evidentiary error is lessened, if not completely annulled, when the trial is by the court sitting without a jury." *Id.*

■ Father and Mother have failed to provide this Court with any evidence showing that the trial court made an inappropriate or prejudicial inference based on Dr. Ron Smith's testimony. To the contrary, the record reveals that the trial court immediately sustained the parents' objection and granted their motion to strike Shaul's statement concerning the polygraph results. The trial court also made clear in its findings 9, 42 and 43 that it based its determinations that A.J. had been sexually abused by Father, and that Mother had failed to protect A.J. from said abuse, on free-standing evidence completely independent of Dr. Ron Smith's poly-

graph testimony. For example, the trial court relied upon testimony concerning A.J.'s observed behaviors, including her depression, nightmares, problems using the bathroom and public masturbation, which were consistent with typical behaviors exhibited by children who had suffered physical abuse. The trial court also considered the therapeutic nature of the setting in which A.J. made her statements of abuse to her therapist, Cottrell, the detailed nature of A.J.'s statements, and the testimony of both Cottrell and Dr. Papandria. Even assuming arguendo that the trial court improperly admitted Dr. Ron Smith's polygraph testimony, there simply is no evidence in the record that substantiates the parents' claim that the trial court made an impermissible or prejudicial inference based on that testimony in order to establish that A.J. was molested by Father, or that Mother failed to protect A.J. from the sexual abuse. Accordingly, we find no error.

## II. Whether Trial Court's Decision was Clearly Erroneous

Next, Father and Mother argue that the trial court's order terminating their parental rights was clearly erroneous. Initially, we note our standard of review.

■ This court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind.Ct.App.2001). Thus, when reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re Termination of Parent–Child Relationship of D.D.*, 804 N.E.2d 258, 264 (Ind.Ct.App. 2004), *trans. denied.* We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.*

■ Here, the trial court made specific findings in granting the termination of Father's and Mother's parental rights. Where the trial court enters specific findings of fact, we must first determine whether the evidence supports the findings. *Id.* Then, we determine whether the findings support the judgment. *Id.* We will not set aside the trial court's judgment terminating parental rights unless it is clearly erroneous. *Rowlett v. Vanderburgh County Office of Family and Children*, 841 N.E.2d 615, 620 (Ind.Ct.App. 2006), *trans. denied.* A finding is clearly erroneous when there are no facts or inferences drawn therefrom that support it. *D.D.*, 804 N.E.2d at 264. A judgment is clearly erroneous only if the findings of fact do not support the trial court's conclusions thereon, or the conclusions thereon do not support the judgment. *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind.1996).

■ "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct.App.1996), *trans. denied.* However, these parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities. *K.S.*, 750 N.E.2d at 836.

■ In order to terminate a parent-child relationship, the State is required to allege and prove by clear and convincing evidence that:

(A) [o]ne (1) of the following exists:

(i) the child has been removed form the parent for at least six (6) months under a dispositional decree;

. . .

(B) there is a reasonable probability that:

(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind.Code § 31–35–2–4(b). The State must establish each of these allegations by clear and convincing evidence. *Egly v. Blackford County DPW*, 592 N.E.2d 1232, 1234 (Ind.1992).

 Father and Mother do not challenge the trial court's finding that A.J., E.J., and J.J. had been removed for more than six months under a dispositional decree. Rather, the parents assert that the MCDCS failed to provide sufficient evidence pertaining to all the remaining statutory elements set forth above. Thus, the parents conclude that the trial court's order terminating their parental rights is clearly erroneous. We disagree.

A careful review of the record reveals that the trial court's detailed findings are supported by the evidence. Moreover, these findings, in turn, support the trial court's conclusions and ultimate judgment terminating the J.s' parental rights. The record clearly supports the trial court's findings that A.J. had been sexually molested by Father, and that Mother had failed to protect her from these molestations. A.J.'s own testimony regarding the abuse she suffered while in the care of her parents was both detailed and credible. It was also substantiated by the testimony of Cottrell, her therapist, and Dr. Papandria. Moreover, the record also supports the trial court's findings that Mother suffered from mental health issues, which were not likely to be remedied, and thus, the risk of future neglect and the endangerment of all three children would also not likely be remedied. At the time of the final termination hearing, Mother was not in compliance with the terms of the Dispositional Order. Additionally, Mother testified that she believed she did not have a mental health problem and continued to deny Father had ever molested A.J. Mother further admitted that she had not participated in any psychological evaluation since February of 2006, and, despite multiple recommendations by her therapists and case managers, she had not participated in any follow-up counseling, nor taken any medications for her mental health issues since February of 2006. Moreover, subsequent to February of 2006, Dr. Ron Smith continued to have concerns regarding Mother's mental health issues and her inability to progress in therapy, and Mother's most recent case manager, Debra Mullins, witnessed behaviors consistent with Dr. Ron Smith's concerns, including extreme belligerence, defensiveness, irrational thinking, and screaming at the case manager.

Similarly, at the time of the final termination hearing, Father still had not admitted to sexually molesting A.J. Nor had Father completed *any* of the services recommended by the MCDCS, including the sexual offender classes, which were necessary for reunification. We further note that the Guardian ad Litem assigned to the parents' case testified that termination of Father's and Mother's parental rights and subsequent adoption was in the best interests of the children; and, the MCDCS had a satisfactory plan for the care and treatment of all three children following termination of Father's and Mother's parental rights, namely, adoption.

The parents make a multitude of assertions on appeal, including, but not limited to the allegations that (1) "the trial court's decision to terminate [Mother's] and [Father's] parental rights was based on a long line of *assumptions* regarding allegations of molestation and the need to treat [Mother] and [Father][,]" (2) "DCS did not prove the reasons for continued removal from [Father's] and [Mother's] custodies could not be remedied[,]" (3) the reasons for continued removal "during the early part of the CHINS [proceedings] were presumably the allegations A.J. made against [Father]" but [A.J.]'s allegations of abuse were made "about eight weeks" after her removal from her parent's care, (4) MCDCS "puts much stock in its assertion that [Mother] failed to attend additional health treatment" despite the fact Case Managers Shaul and Mullins failed to follow up their verbal referrals in writing, (5) "[t]here was no physical evidence of abuse" of A.J., and (6) "the record is devoid of evidence of instances or allegations [Mother] and [Father] ever acted in a manner that threatened E.J.'s or J.J.'s well being." Appellant's Br. at 8, 10–13, 16, 18. These allegations of error amount to nothing more than an invitation to reweigh the evidence, which we cannot do. *See In re J.T.*, 742 N.E.2d 509, 511 (Ind.Ct.App. 2001) (holding that an appellate court, in reviewing the sufficiency of the evidence, cannot reweigh the evidence or judge the credibility of witnesses), *trans. denied.*

Affirmed.

DARDEN, J., and MAY, J., concur.