## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**
Dec 22 2015, 9:49 am
*Kevin S. Smith*
**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of F.W., Minor Child, and<br><br>C.W., Mother,<br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services,<br>*Appellee-Petitioner.* | December 22, 2015<br><br>Court of Appeals Case No. 16A01-1506-JT-766<br><br>Appeal from the Decatur Circuit Court<br><br>The Honorable Timothy B. Day, Judge<br><br>Trial Court Cause No. 16C01-1408-JT-236 |

**Najam, Judge.**

## Statement of the Case

C.W. ("Mother") appeals the trial court's termination of her parental rights over her minor child F.W. ("Child"). Mother raises a single issue for our review, namely, whether the State presented sufficient evidence to support the termination of her parental rights. We affirm.

## Facts and Procedural History

Mother gave birth to Child on March 21, 2013.[1] On July 24, an interested party contacted the Indiana Department of Child Services ("DCS") to report that Mother: was using illegal substances; was "homeless and leaving [F.W.] with random people"; and had not seen F.W. for two weeks. Appellant's App. at 22. Amanda Payne, a DCS family case manager, made contact with Mother, who stated that she was living with her boyfriend's parents. Payne was unable to confirm the veracity of that information. At that time, Mother, who has three other children, was "currently under [a] court's order in a separate DCS case requiring her to give drug screens to DCS," but Mother refused Payne's request that she submit to a drug screen. *Id.* at 13. In addition, Mother was "becoming less cooperative with attending her supervised visits with her 3 other children and with meeting with service providers." *Id.* Accordingly, DCS filed

---

[1] Child's father has not been identified and has not registered with the putative father registry.

a petition alleging that Child was a child in need of services ("CHINS"). DCS removed Child from Mother's care on July 26.

[2] On July 30, the trial court found Child to be a CHINS. Then, following a dispositional hearing in August, the trial court ordered Mother to: maintain contact with her family case manager weekly; maintain appropriate housing; not use controlled substances without a valid prescription; submit to random drug screens; complete a psychological evaluation; participate in home-based counseling; and participate in visitation. Mother's participation in those ordered services was grossly inconsistent. For example, following a psychological evaluation in January 2014, a therapist recommended that Mother attend weekly or bi-monthly therapy sessions. Mother attended one therapy session in January; two in June; and one in August. Due to Mother's noncompliance, her therapy was terminated. Mother also failed to stay in regular contact with her family case manager, and she refused all but three random drug screens. Mother failed two out of the three drug screens.

[3] On August 15, 2014, DCS filed a petition for the involuntary termination of Mother's parental rights to Child. Following an evidentiary hearing on the petition on January 29, April 17, and June 4, 2015, the trial court entered the following relevant findings and conclusions in support of terminating Mother's parental rights:

> 2. There is a reasonable probability that:

a. The conditions which resulted in Child's removal and continued placement outside the home will not be remedied by parents as shown by:

 i. Mother's instability for the past two years and longer;

 ii. Mother's housing instability, including times where she is homeless and times where she has lived in a tent;

 iii. Mother's mental health has not improved despite being provided opportunities by DCS to address her needs and has chosen not to do so;

 iv. No father has come forward throughout the case or upon the termination of parental rights being published.

b. That continuation of the parent-child relationship poses a threat to Child's wellbeing as shown by:

 i. Since there has been no improvement in mother's mental health, she is a danger to the child in her current state as there is evidence in testimony and in the court hearings in this cause of action as well as the CHINS action of anger outbursts by mother, irrational behaviors, choosing inappropriate caregivers for her children and inconsistency in visits.

3. Termination of parental rights is in Child's best interests:

a. In addition to the above, the Court notes that no father has ever been involved in the child's life either during the CHINS case or in the above cause.

b. The child's CASA testified that termination is in the child's best interest.

c. Further, mother has been provided several opportunities to appear for these proceedings and despite good notice, has not appeared on either the April 17 or June 4 hearings to present her case.

4. There is a satisfactory plan for the care and treatment of Child, that being adoption;

a. The Court acknowledges that the child's aunt, [J.K.], who is the child's current placement and presumed adoptive parent may have some financial difficulties; however, it appears that the child's needs are sufficiently met and further that [J.K.] has always been there for the child.

* * *

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED: That DCS' petition for termination of parental rights is granted; and that the parent-child relationship between the child [F.W.] and her Mother, [C.W.] and to her father, any unknown alleged father, is hereby terminated.

*Id.* at 231-32. This appeal ensued.

# Discussion and Decision

[4] We begin our review of this appeal by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the

Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Family & Children (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cnty. Ofc. of Family & Children (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[5] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * *
>
> (C) [and] that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2). That statute provides that DCS need establish only one of the requirements of subsection (b)(2)(B) before the trial court may terminate parental rights. DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[6] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cnty. Ofc. of Family & Children (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cnty. Ofc. of Family & Children (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999). *trans. denied*.

[7] Here, in terminating Mother's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Ofc. of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.*

"Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[8] Mother contends that the evidence is insufficient to support the trial court's findings underlying its conclusions that Mother will not remedy the conditions that resulted in Child's removal; that the continuation of the parent-child relationship poses a threat to the well-being of Child; and that termination is in the best interest of Child. Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, we only address the sufficiency of the evidence to support the trial court's conclusions that continuation of the parent-child relationship poses a threat to Child's well-being and that termination is in Child's best interest. And we address each of those contentions in turn.

### Continuation of the Parent-Child Relationship

[9] In support of this conclusion, the trial court stated as follows:

> Since there has been no improvement in mother's mental health, she is a danger to the child in her current state as there is evidence in testimony and in the court hearings in this cause of action as well as the CHINS action of anger outbursts by mother, irrational behaviors, choosing inappropriate caregivers for her children and inconsistency in visits.

Appellant's App. at 232. Mother contends that the court's findings on this issue are "not supported by the evidence." Appellant's Br. at 16. In particular, Mother asserts that

> DCS presented no evidence to show Mother ever endangered F.W. Though caseworker Miller saw Mother angry at visits, but [sic] she never directed her anger towards her daughter. And Miller never stated Mother acted violently, rather she yelled at her kids.

> * * *

> Another of the court's findings hinges on Mother leaving the child with inappropriate caregivers. Obviously this did not happen after F.W.'s removal. Before DCS took custody of the child, Mother often left her with Aunt [J.], the woman who now wishes to adopt the child. If Aunt [J.] had been an "inappropriate" caregiver, the court would not have approved of the plan to allow her to adopt F.W.

> Much of DCS's case hinged in the fact Mother had not worked aggressively with service providers to change her circumstances. But before one judges Mother too harshly, it is necessary to understand the difficulties which impact Mother. Mother presented to the court as a woman with reduced mental capacity. When she was a child, Mother went into foster care and suffered after being subjected to emotional, physical and sexual abuse. Given her history, Mother entered the case distrustful of the same agency she felt had never supported her as a child.

> Unable to initially grasp why DCS kept removing her children, Mother lashed out at those trying to help her. That Mother did not avail herself [of] services offered to her can be explained by Mother's limited functioning and her general distrust of the system which she felt failed her.

Appellant's Br. at 16-17 (citations omitted).

[10]     First, while the evidence does not show that Mother had expressed anger towards Child during supervised visits, there is evidence that Mother had angry outbursts and had, on one occasion, expressed anger toward her children. In particular, the evidence shows that: during supervised visits with Child, Mother "would cross some boundaries as far as . . . becoming very upset" and behaving in an "inappropriate" manner in front of Child; Mother "had her moments of getting pretty hostile" with the family case worker; and she "expressed a lot of anger with her DCS case workers as well." Tr. at 58, 68, 73. DCS also presented evidence that, during a June 2014 therapy session, Mother threatened to "take anybody's breath if they took hers," which the therapist took to mean to refer to Mother's children, and Mother stated that "her invisible knife would turn into a real one." *Id.* at 47. The evidence supports the trial court's findings that Mother had angry outbursts and engaged in irrational behavior.

[11]     Second, as to the trial court's finding that Mother left Child with inappropriate caregivers, while the evidence shows that Mother sometimes let J.K. babysit Child, the undisputed evidence also shows that, at the time of Child's removal, Mother was "homeless and moving from place to place with [Child] and dropping [Child] off [with] random babysitters for extended periods of time." Appellant's App. at 30. The evidence supports the trial court's finding on this issue.

[12] Third, to the extent Mother asks that we excuse her behavior in light of her bad experiences with the foster care system as a child and her "limited functioning," Mother does not explain her refusal to attend all but a few therapy sessions. Mother's therapist, Linda Brown, testified that she had hoped to "continue to evaluate the need for . . . substance abuse treatment" in light of Mother's marijuana use. Tr. at 44. Brown also testified that she had referred Mother to an adult case management service, which would have helped Mother learn life skills, such as maintaining stable housing, but Mother did not pursue that service.

[13] A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *Shupperd v. Miami Cnty. Div. of Family & Children (In re E.S.)*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). When the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate. *Id.*

[14] The undisputed evidence shows that Child was removed from Mother's care only a few months after Child's birth. During the CHINS proceedings, Mother barely maintained contact with her family case manager; she has not maintained suitable or stable housing; she has not consistently visited with Child; she did not follow through on recommended individual therapy, including additional substance abuse evaluation; she refused all but three drug screens; and she failed two out of the three drug screens. In short, Mother has

been more non-compliant with the court's orders than compliant. Finally, when asked to describe how Mother did in her supervised visits with Child, Scott Miller, the case manager who supervised those visits, testified that "there was always a lack of stability there and concerns with how she would actually do if she had to care for her full time." Tr. at 56. And Miller testified that Mother had lost her bond with Child due to her failure to participate in consistent and frequent visits with Child. Mother's contentions on appeal amount to a request that we reweigh the evidence, which we will not do. The trial court's findings support the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being.

### Best Interests

In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d at 224.

Again, Mother's contention on this issue amounts to a request that we reweigh the evidence, which we will not do. Justin Rowland, a family case manager, summed up the evidence showing that termination is in Child's best interests as follows:

> [Mother]'s not been able to maintain appropriate care of herself. She has not been consistent with services. She has not been able to work towards any progress on her mental health. She has failed drug screens. She . . . has not had housing stability throughout the life of the case. And I do not feel that [Child] would be safe in an environment with [Mother] as the caregiver.

Tr. at 85. Finally, Pam Meyer, the Court Appointed Special Advocate, testified that she "believe[d] very strongly that it's in [Child]'s best interest" that Mother's parental rights be terminated. *Id.* at 104. We hold that the totality of the evidence supports the trial court's conclusion that termination is in Child's best interest. The trial court did not err when it terminated Mother's parental rights to Child.

Affirmed.

Riley, J., and May, J., concur.