## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 28 2016, 8:54 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer A. Joas
Madison, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of: T.M., M.M., E.M., Jn.M., and Js.M. (Minor Children), | November 28, 2016 |
| | Court of Appeals Case No. 40A01-1604-JT-866 |
| T.M., Jr. (Father), | Appeal from the Jennings Circuit Court |
| *Appellant-Respondent,* | The Honorable Jon W. Webster, Judge |
| v. | Trial Court Cause Nos. 40C01-1511-JT-28, 40C01-1511-JT-29, 40C01-1511-JT-30, 40C01-1511-JT-31, and 40C01-1511-JT-32, |
| Indiana Department of Child Services, | |
| *Appellee-Petitioner.* | |

**Najam, Judge.**

## Statement of the Case

T.M., Jr. ("Father") appeals the trial court's termination of his parental rights over his minor children T.M., M.M., E.M., Jn.M., and Js.M. (collectively "the Children"). Father raises a single issue for our review, namely, whether the State presented sufficient evidence to support the termination of his parental rights. We affirm.

## Facts and Procedural History

Father and W.M. ("Mother") (collectively "Parents") have five children together, namely, T.M., born July 25, 2007; M.M., born June 6, 2008; E.M., born June 26, 2009; and twins Jn.M., and Js.M., born May 18, 2010.[1] On September 19, 2013, someone with the Jennings County Sheriff's Department contacted the Indiana Department of Child Services ("DCS") to report that Father and Mother had been found "passed out" in their vehicle, which was parked in the front yard of their residence, while a child[2] was strapped in a car seat in the back seat. Tr. at 38. In response to that report, DCS Assessor Deborah Satterfield drove to the residence to assess the situation. Father and Mother were awake, but "very lethargic," and they were inside the house by the

---

[1] Mother's parental rights to the children were also terminated, but she does not participate in this appeal.

[2] The transcript identifies the child as "D.M.," but the parents do not have a child named D.M. The trial court's findings state that Jn.M. was in the car at the time.

time Satterfield got there. Satterfield "provided them with paperwork" and "discussed the allegations," and, after forty-five minutes of trying, Satterfield obtained drug screens from them. *Id.* at 39. Father tested positive for Oxycodone and Tramadol, and Mother tested positive for Diazepam, Nordiazepam, and Oxycodone. The Parents did not have prescriptions for any of those drugs. Satterfield removed the Children from the Parents' care.

[3] On September 23, DCS filed petitions alleging that the Children were Children in Need of Services ("CHINS"). In particular, DCS alleged that the Parents were "found in their car intoxicated to the point of unconsciousness," with a child in the car; the Parents "had been 'passed out' for approximately 25 minutes before they were able to be awakened"; when they woke up, Mother "had what appeared to be a white powder around her nostrils and was extremely lethargic," and Father was "drooling and incapable of conversation"; and the Parents were unable to care for the child in the car. Petitioner's Ex. 1B. In addition, DCS noted that the Parents

> have a long history with DCS, they have had 8 substantiations and 2 previous cases in the last 4 years. Both parents have severe mental health issues and have a history of abusing their prescribed medications. At the time of removal all the children were extremely dirty. [Jn.M.] had open sores on her head from lice infestation and numerous insect bites on her arms and legs. [Js.M.] had 2 black eyes and red marks on his upper forehead.

*Id.* During the initial hearing on those petitions, the Parents denied the allegations. Following a factfinding hearing, the trial court adjudicated the

Children to be CHINS and the court ordered the Parents to comply with an Order of Participation, which included: contacting the family case manager ("FCM") every week; submitting to random drug screens; completing any assessments and/or programs recommended by the FCM, including a substance abuse assessment; maintaining safe, stable, and clean housing; and engaging in a home-based counseling program. The Parents' compliance with that dispositional order was inconsistent.

[4] On November 30, 2015, DCS filed petitions to terminate the Parents' parental rights to the Children. Following a hearing, the trial court granted those petitions. In support of its order, the trial court entered the following findings and conclusions:

> 8. On or about September 19, 2013, children and parents, [T.M.], Jr., (hereinafter Father) and [W.M.] (hereinafter Mother), became involved with DCS when DCS investigated a report that the children were being neglected by their parents. (Petitioner's Exhibit's 1-B through 1-D, 1-F). More specifically, the facts are that Father and Mother had been found intoxicated to the point of unconsciousness while child [Jn.M.], was in the vehicle with them. Father and Mother have a long history with DCS that includes nine substantiations and two previous cases in the last several years. The parents needed assistance in effectively and appropriately parenting the children. (Petitioner's Exhibit 1-F).
>
> * * *
>
> 14. After the Dispositional Decree of June 13, 2014, the children were returned to the parents' care and custody for a trial home visit from February 3, 2014[,] until May 6, 2014.

15. The children were removed from the parents' home on May 6, 2014[,] due to an altercation between Mother and Father, and due to Father's mental state.

16. Since that time, the children have not been returned to the parents' care and custody.

\* \* \*

18. During the supervised visits Father was very harsh with the children and did not show any affection to the children. Father's only interaction with the children during supervised visits was to discipline them.

19. From October of 2013 to May of 2014 the Mother and Father were fairly consistent in participating in services. Father and Mother maintained contact with the Department of Child Services, enrolled in programs through Centerstone, and completed their substance abuse assessments. Mother and Father frequently tested positive for their prescription medications, and at times the medication levels were above their level of therapeutic need.

20. Because Father and Mother had begun to demonstrate some parental improvement, Father and Mother had been permitted a trial-home-visit with the children starting on February 3, 2014.

21. However, on May 6, 2014, DCS removed the children from the trial-home-visit due an altercation between Mother and Father in front of the children, and due to Father's mental state.

22. On or about May 12, 2014, the Court granted the change of placement and terminated the trial home visit. The children were placed in foster care. (Petitioner's Exhibit 1-E).

23. Father was arrested for the events that took place while the children were on the trial home visit, and [he was] charged with

Domestic Battery Committed in the Presence of a Child Less Than 16, a Class D Felony. Father was incarcerated until November 19, 2014. Father was convicted of said charge on May 7, 2015. (Petitioner's Exhibit 5-A, 5-B, and 1-I).

24. Father had been previously convicted in 2013 of two (2) counts of Neglect of a Dependent, both Class A Misdemeanors. (Petitioner's Exhibit 4-A-C).

* * *

28. A periodic case review was held on December 10, 2014. . . . Father had not participated in services due to his incarceration. While additional services were not required for Mother and Father at that time, the parents were required to immediately begin participating in the services that had been previously ordered. (Petitioner's Exhibit 1-I).

29. After the periodic case review in December, Father completed a substance abuse assessment. After the assessment it was recommended that Father participate in individual therapy, home based case work, recovery coach, and psychiatric services.

30. Father did not participate in individual therapy, home based case work, or psychiatric services. Father had sporadic and inconsistent participation with his recovery coach.

* * *

33. Mother and Father did not consistently keep in contact with the Family Case Manager, Elisha Tempest.

34. Both Father and Mother receive Social Security Disability, but it is not enough to support their five children.

35. Father and Mother do not have stable housing, and [they] are currently homeless.

36. Father and Mother continued to test positive for prescription pain medication, such as oxycodone. In some instances, their positive results were much higher than the therapeutic level. (Petitioner's Exhibit 2 & 3).

37. Father tested positive for methamphetamine as recently as October of 2015.

38. A periodic case review was held on March 11, 2015, to address Father, Mother, and children's progress. Mother and Father had not complied with the case plan at that time. The Court found . . . that Father was not in compliance with the case plan because he had been incarcerated for most of the reporting period and was unable to participate in services. The Court also found that Father had not yet started services since his release on November 19, 2014. The parents had been participating in supervised visitations with the children, but they were ceased due to the visits causing the children's behavioral issues to escalate. (Petitioner's Exhibit 1-J).

39. A permanency hearing was held on September 2, 2015, to address the children's permanency plan. The Court found . . . that Father was not in compliance with the case plan due to his sporadic participation with his recovery coach. Father also refused to participate in individual counseling and home based services. Both Mother and Father refused to meet with a care-coordinator from Centerstone. (Petitioner's Exhibit 1-L).

40. Father has failed to address both his substance abuse and mental health issues. Father did not financially support the children throughout the case. Father did not call to inquire about the well-being of his children. Father did not write any letters to the children, send the children any cards, or leave any messages with DCS for the children throughout the case. Father has not visited with the children since March of 2015.

\* \* \*

42.  Child, [T.M.], III, receives therapy for his behavioral issues. [Child T.M.] has been diagnosed with Post-Traumatic Stress Disorder (PTSD) from the physical abuse he received from Father. [Child T.M.'s] PTSD also stems from witnessing his parents fighting. [Child T.M.] currently has power struggles with adults and lacks an ability to show emotion. [Child T.M.] needs structure and stability. [Child T.M.] still needs, and will continue to need, therapy to address his ongoing behavioral issues. Lynn Pittman, the child's therapist, opined that [child T.M.] needs a structured and stable home environment.

43.  [Child M.M.] receives therapy for her behavioral issues. [Child M.M.] has been diagnosed with Post-Traumatic Stress Disorder from the physical, verbal, and emotional abuse she received from parents. [Child M.M.] still struggles with verbal and physical aggression against others. [Child M.M.] still needs, and will continue to need, therapy to address her ongoing behavioral issues. Michelle Striegel, the child's therapist, believes that [child M.M.] needs a stable home environment.

44.  [Child E.M.] receives therapy for his behavioral issues. [Child E.M.] has been diagnosed with Post-Traumatic Stress Disorder. Andrea Donnells, the child's former therapist, opined that the child regressed while he was on the trial home visit with his parents. After the trial home visit, [child E.M.] was physically aggressive, and it took him some time after visits ended with parents to stabilize his behaviors.

45.  Family Case Manager, Elisha Tempest, believes that adoption is in the children's best interests. The Guardian Ad Litem Debra J. Peetz also echoed that adoption and termination of parental rights is in the children's best interests. The Guardian Ad Litem also filed a written report with the Court on February 19, 2016, which is made a part hereof by reference, and which expresses the same sentiment as her testimony.

46. DCS's plan for the children is that they be adopted; this plan is satisfactory for the children's care and treatment.

Appellant's App. at 44, 46-50. This appeal ensued.

## Discussion and Decision

[5] We begin our review of this appeal by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Family & Children (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cnty. Ofc. of Family & Children (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[6] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the

reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

* * *

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cnty. Ofc. of Family & Children (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cnty. Ofc. of Family & Children (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[8] Here, in terminating the Parents' parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Ofc. of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[9] Father's challenge on appeal is very narrow. Father *concedes* that the evidence is sufficient to support the trial court's findings underlying its conclusions that Father will not remedy the conditions that resulted in the Children's removal and that the continuation of the parent-child relationships poses a threat to the well-being of the Children. Father only challenges the sufficiency of the evidence to show that termination is in the best interests of the Children and that there is a satisfactory plan for the Children. We address each of those contentions in turn.

### Best Interests

[10] In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *A.S. v. Ind. Dep't. of Child Servs. (In re A.K.)*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to provide adequate housing, stability and

supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Ofc. of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and *the testimony of the service providers may support a finding that termination is in the child's best interests*." *In re A.K.*, 924 N.E.2d at 224 (emphasis added).

[11] Father contends that, because DCS cannot show that the Children will be placed together in one home, DCS cannot show that termination of his parental rights is in the Children's best interests. In particular, Father maintains that the evidence shows that "it was imperative that all five (5) children remain in contact with one another" and that the "likelihood is slim to none that all five (5) children would be adopted together." Appellant's Br. at 14. But Father's contentions amount to a request that we reweigh the evidence, which we will not do.

[12] As the trial court found, Elisha Tempest, the FCM, testified that adoption is in the children's best interests. The Guardian Ad Litem Debra Peetz also testified that adoption and termination of parental rights is in the children's best interests. The totality of the evidence, including Father's historical inability to provide a safe and stable home and his refusal to take advantage of the resources DCS provided him during the CHINS proceedings, supports the trial court's conclusion that termination of Father's parental rights is in the Children's best interests.

### *Satisfactory Plan*

In order for the trial court to terminate the parent-child relationship, the trial court must find that there is a satisfactory plan for the care and treatment of the child. *A.P. v. Marion Cnty. Ofc. of Family & Children (In re D.D.)*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*. This plan does not need to be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *Id.*

The undisputed evidence shows that DCS plans to place the Children for adoption. The trial court's conclusion on this issue is supported by clear and convincing evidence. While keeping the Children together as a family unit would be ideal, it is not required to terminate Father's parental rights. The trial court did not err when it terminated Father's parental rights to the Children.

Affirmed.

Bailey, J., and May, J., concur.