## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

08/31/2017, 9:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Marilyn Tucker Fullen
Tucker and Tucker, P.C.
Paoli, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:
K.M.W. & K.W. *(Minor Children)*,

and

M.W. *(Mother)* & D.W. *(Father)*

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

August 31, 2017

Court of Appeals Case No.
59A04-1703-JT-590

Appeal from the Orange Circuit Court

The Honorable John T. Evans, Special Judge

Trial Court Cause Nos.
59C01-1606-JT-133
59C01-1606-JT-134

**Robb, Judge.**

# Case Summary and Issue

[1] M.W. ("Mother") and D.W. ("Father") appeal the juvenile court's termination of their parental rights to K.M.W. and K.W. ("Children"), raising four issues for our review, which we consolidate and restate as whether the juvenile court's termination order is clearly erroneous. Concluding the termination order is not clearly erroneous, we affirm.

# Facts and Procedural History

[2] Mother and Father are the parents of K.M.W., born September 2003, and K.W., born July 2008. The Indiana Department of Child Services ("DCS") first became involved with the family in 2006 after it was reported Mother and Father neglected K.M.W., then three years old. DCS determined K.M.W., who is developmentally disabled, was failing to thrive under the care of Mother and Father, her hygiene was poor, and her living environment endangered her life and health. K.M.W. was adjudicated a child in need of services ("CHINS") and placed in foster care. After Mother and Father complied with services and secured a satisfactory living arrangement, DCS ceased services and returned K.M.W. to Mother and Father's care.

[3] Shortly following K.W.'s birth in July 2008, DCS substantiated an allegation the Children's living environment was endangering their life and health. A period of informal adjustment ensued, which Mother and Father completed. In

2012, DCS substantiated an additional allegation that Mother and Father neglected the Children.

[4] In October 2014, DCS received a report alleging Mother and Father neglected the Children. DCS investigated the allegations and identified horrid conditions in the home, including a strong smell of urine, a blue carpet turned black with dirt and grime, heaps of trash, and cockroaches. DCS also learned K.M.W. sometimes rubbed feces on her face and had a history of open sores on her bottom from urinating herself on a nightly basis,[1] the family's dog often defecated and urinated on the Children's clothing and throughout the home, the Children's clothing smelled strongly of urine, K.M.W. suffered from untreated scabies and lice, and K.W. suffered from untreated lice. In addition, neither Mother nor Father allowed DCS access to the bedrooms, each parent considered the Children's clothes to be clean, and Father acted aggressively toward DCS employees.

[5] On November 7, 2014, DCS filed a petition alleging the Children were CHINS, claiming the Children's physical and mental health was seriously impaired or endangered as a result of Mother and Father's inability to provide necessary supervision, food, medical care, clothing, shelter, and education. The Children were removed from Mother and Father's care. K.M.W. was placed in the

---

[1] K.M.W. suffers from enuresis and encopresis, resulting in involuntarily urination and defecation.

Indiana Developmental Training Center ("IDTC") and K.W. was placed in foster care.

[6] In December 2014, K.W. received in-home placement with Mother and Father. On January 26, 2015, Mother and Father admitted the allegations set forth in the DCS petition and the juvenile court adjudicated the Children as CHINS. The juvenile court ordered K.W. be placed with Mother and Father and K.M.W. to continue with her placement at the IDTC. In the dispositional decree, the juvenile court ordered Mother and Father to participate in services; maintain safe and suitable housing, properly feed, clothe, and supervise the Children; attend to the Children's physical, mental, and medical needs; and provide the Children with a safe, secure, and nurturing environment free from abuse and neglect.

[7] In February 2015, DCS received a report alleging the family's home was very dirty and K.W. did not have any clean clothes. The following month, DCS visited the home and found the floor of K.W.'s room was completely covered in clothes, the kitchen was dirty and old food was left out, and there was waste in the toilet. Father explained the toilet was broken.

[8] In April, K.W. missed a dentist appointment. DCS then visited the home and found it to be appropriate, except Mother and Father had failed to fix the toilet. DCS questioned Mother and Father as to why they had not visited or called K.M.W. at the IDTC since March. Mother explained they did not have gas in their vehicle nor any minutes remaining on their cell phone. Mother also

explained she did not have any shampoo, conditioner, or toilet paper. Father was very combative during the visit.

[9] The next day, DCS visited K.M.W. at the IDTC. There, K.M.W.'s therapist explained Mother and Father had not visited for nearly two months, and despite being allowed to call K.M.W. daily, Mother and Father did not call more than once a week and often failed to follow through when they said they would call.

[10] In July, DCS learned K.W. had untreated scabies with open sores and there was minimal food in the home. Despite the scabies diagnosis, Mother and Father did not believe K.W. was suffering from scabies. DCS thereafter moved the juvenile court to remove K.W. and place her in foster care, which the juvenile court granted. It was later discovered Mother and Father also had scabies.

[11] Over the next few months, K.W. and K.M.W. flourished in foster care. By December 2015, Mother and Father were allowed unsupervised home visits with the Children after Mother and Father had been keeping the home appropriate for the Children. However, in January 2016, DCS learned that during one of K.W.'s home visits, Mother and Father were not giving K.W. her medicine. K.W.'s foster mother also reported K.W. returned from a home visit with feces in her underwear.

[12] In February 2016, the guardian ad litem observed ants throughout the family's home, spoiled food in the refrigerator, and that the home was dirtier than

previous months. She also learned K.W.'s behavior at school was disruptive only on the days she visited with Mother and Father. During the same month, K.M.W. explained to her therapist that during a recent home visit, the family's home was covered with bugs. The therapist later explained to DCS that K.M.W.'s behavior had turned disruptive since she began home visits with Mother and Father. DCS then visited the home and observed the kitchen was cluttered, there were open food containers on the counters, and a dish on the kitchen floor was filled with cockroaches. DCS also observed cockroaches in other areas of the home. Moreover, the home contained little food.

[13] On June 1, 2016, DCS filed a petition to terminate Mother and Father's parental rights and changed the Children's permanency plan to adoption. On July 11, 2016, DCS visited the home for the final time and observed cockroaches in the kitchen crawling on the refrigerator and counter, the refrigerator was tilting and appeared as if it might fall through the floor, and the home was dirty. Following three evidentiary hearings in January 2017, the juvenile court issued its order terminating parental rights, relevant portions of which we quote below:

> 25. Father and Mother have received services and community referrals since as early as 2006.
> * * *
> 27. Father and Mother each underwent a psychological evaluation . . . . Each parent has issues to overcome and for

which he/she must compensate.[2]

* * *

30. Historically, Father is not willing to accept help or try something different to see if it will work. Father is aggressive, argumentative, and obstructive. Father resists recommendations, is very guarded, and responds that it is already as good as it can be. Father often argues with service providers about what he does not need to do or what others, such as DCS, or the Judge, or others, are doing wrong. Father sometimes obstructs service providers or the GAL, including prohibiting DCS and the GAL from viewing the girls' bedroom. . . .

31. Father is very concrete in his thinking. Father may correct the one thing pointed out to him, but is unable to generalize the instructions to apply to other things or other areas in the home. Generally, Father simply denies that a problem exists, even when it is brought to his attention. At one point, Father described the reasons for DCS removal of the children in 2014 as cleanliness and clutter, believing the home to simply be "messy." At another time, Father described the reasons for DCS removal of the children as only because of [a relative] molesting them.[3]

* * *

33. Mother leaves it to Father to speak for the family and make decisions. Father is the family decision-maker. Mother refers issues to Father for decision.

34. Mother describes the home at the time of removal as "cluttered," explaining that she had not had a chance to take the trash out and she had a headache for four days. Mother describes that she cleans as best as she can, but she gets sick a lot and now that she is working she is tired.

---

[2] Father's psychological evaluation revealed Father is Moderately Mentally Retarded and can parent only with the support of others. Mother's psychological evaluation revealed Mother has the ability to care for the Children and meet their needs, but given her medical issues, it would be difficult for Mother to provide a high level of care and oversight to the Children.

[3] The record reveals allegations the Children's grandfather sexually abused the Children, but it is unclear whether DCS substantiated those allegations.

35. In October, 2015, Mother obtained employment at the casino, the first job of her life . . . . This has left Mother even more tired, stressed, and disconnected. Mother has missed parenting time because she went to bed. Other times, Mother simply did not interact and left Father to do all the talking.

36. Father and Mother do not view issues of cleanliness and hygiene as issues of concern. Both repeatedly deny that problems exist and as a result, take no action to correct. Father aggressively denies that he and Mother fail to provide [the Children] with a safe environment, free from neglect. Mother either denies that an issue exists or minimizes it. After years of neglecting their children, not only do Father and Mother fail to recognize their own neglect, they fail to comprehend that they are the cause of their children's neglect.

* * *

38. Father and Mother both fail to recognize that [K.M.W.'s] particular needs are extensive. Father treats the situation as a discipl[in]e issue. Mother believes home-schooling is appropriate for [K.M.W.] Father believes public school is appropriate for [K.M.W.].

39. Father and Mother now live in a two bedroom, one bathroom trailer . . . . They have made repairs and corrections to the trailer including replacing carpeting and paying for commercial pest control quarterly. DCS last viewed the premises in July, 2016, and observed: outside was very messy, with piles of trash, broken toys, trash and furniture on the porch; inside was cockroaches and exposed food. Father and Mother describe that they have corrected these issues as of February, 2017, although roaches are still present.

40. [K.M.W.] is likely the most developmentally delayed child her clinical service specialist has ever seen. At the time of detention, she did not know how to take a shower and struggled cleaning herself after soiling herself. She required regular prompts for personal hygiene and potty training, including being awakened by staff in the middle of the night to use the restroom.

* * *

42. [K.M.W.] appears to be making overall progress. However,

[K.M.W.] has a very low I.Q. and is never going to be able to live independently. She will never be appropriate for public school.

43. [K.M.W.] is very special needs and has very specific needs that must be addressed in a particular way and on a schedule.

* * *

46. [K.W.] has experienced significant progress since removal. Originally, she was dirty, defensive, smelled bad, very unhappy, sad, and angry. She lived as if in a fantasy world, describing that her brother hides under her bed and touches pretty girls. [The Children] do not have a brother. [K.W.] was anxious and exhibited poor social skills. She would often have temper tantrums and "meltdowns" especially at school. She was very resentful and angry with her sister.

47. Today [K.W.] is greatly improved. She is focused on reality. She has developed self-esteem, a trust of others, confidence, and a mastery over her environment. She now looks forward to visiting with her sister. [K.W.] has an I.Q. of 108 and is doing well in school.

* * *

49. Father and Mother have only been able to elevate their care for their children above minimum standards for short periods of time with assistance. They have never been able to provide consistent care. The situation always returns to chronic neglect of the children.

50. Father and Mother have not enhanced their ability to fulfill their parental obligations.

51. Given the family's extensive, extended history, the severity of the neglect, Mother and Father's inability to recognize when they are neglecting their children and take action to correct it, the Court is firmly convinced that continuation of the parent-child relationship endangers [the Children's] physical health and will significantly impair their emotional development. Father and Mother's historical pattern is one of repeated, extensive, and severe neglect. If the children were again in Father and Mother's care, their repeated pattern predicts additional neglect, continued suffering by [the Children], and a continuing need for intervention and removal of both children. Mother is employed

and Mother and Father have improved the condition of their home. However, the Court does not believe that either parent has otherwise improved his or her ability to provide necessary care for [the Children].

52. DCS's plan for [the Children] is adoption.

Appellant's Appendix, Volume II at 33-39. This appeal ensued.

# Discussion and Decision

## I. Standard of Review

[14] When we review a termination of parental rights, we neither weigh the evidence nor judge witness credibility and we consider only the evidence and reasonable inferences most favorable to the judgment. *In re C.G.*, 954 N.E.2d 910, 923 (Ind. 2011). We apply a two-tiered standard of review to the juvenile court's findings of fact and conclusions thereon: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id.* "We will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. Clear error is that which leaves us with a definite and firm conviction that a mistake has been made." *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1123 (Ind. Ct. App. 2013) (citation omitted).

## II. Termination Order

[15] The termination of parental rights is an extreme measure designed to be utilized only when all other reasonable efforts have failed. *In re K.W.*, 12 N.E.3d 241,

249 (Ind. 2014). Indiana Code section 31-35-2-4(b)(2) details what must be proven in order to terminate parental rights, which we note in relevant part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * *
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

The State must prove each element by clear and convincing evidence. Ind. Code § 31-34-12-2.

[16] Mother and Father contend the juvenile court's termination order is clearly erroneous. Specifically, they claim DCS failed to present clear and convincing evidence sufficient to establish there is a reasonable probability the conditions resulting in the Children's removal will not be remedied, the continuation of the parent-child relationships pose a threat to the Children's well-being, termination of the parent-child relationships is in the Children's best interests, and there is a satisfactory plan for the care and treatment of the Children.

# A. Remedy of Conditions

[17]  In determining whether conditions leading to a child's removal will not be remedied, the juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions. *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). "[I]t is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. The juvenile court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *In re A.B.*, 924 N.E.2d at 670 (citation omitted). However, the juvenile court cannot focus solely on historical conduct to the exclusion of evidence as to the parent's current circumstances or evidence of changed conditions. *In re C.M.*, 960 N.E.2d 169, 175 (Ind. Ct. App. 2011).

[18]  In maintaining DCS did not meet its burden, Mother and Father claim the juvenile court focused solely on their historical conduct and ignored evidence of their current circumstances and changed conditions.[4] Contrary to this view, the findings establish Mother and Father's involvement with DCS dates back to

---

[4] Mother and Father challenge findings 33, 35, 36, 38, and 39. Our review of the record indicates the evidence supports each of these findings and Mother's and Father's arguments are merely a request for this court to reweigh evidence and reassess witness credibility, which we will not do. *In re C.G.*, 954 N.E.2d at 923.

2006 when K.M.W. was removed from Mother and Father's care after they neglected K.M.W. and failed to provide her with a safe living environment. Over the next several years, DCS intervened twice after substantiating similar allegations of neglect. Then, in 2014, DCS learned the Children had poor hygiene and the condition of the family's home threatened the Children's physical and mental well-being. DCS removed the Children, and during the CHINS proceedings, Mother and Father admitted they had failed to provide the Children a clean and appropriate home. Although Mother and Father did participate in services, DCS continued the Children's placement outside of the home due to Mother and Father's inability to consistently maintain a safe living environment for the Children.

[19] During the next two years, DCS visited the home on several occasions. On some occasions, the home was cleaner than times previous, but on other occasions, the condition of the home had severely deteriorated. In fact, following one visit in fall 2015, K.W. described Mother's and Father's home as "disgusting." Exhibit 6 at 24. And in early 2016, K.M.W. stated she did not desire to visit Mother and Father at the home, explaining that during her most recent visit the bugs in the home crawled all over her.

[20] Thus, and as the juvenile court noted, every time Mother and Father improved the conditions of their home and DCS allowed them to again care for the Children, Mother and Father always allowed the home to fall into disarray thereby endangering the Children's health. Asked whether she believed Mother

and Father had, or could, remedy the conditions that led to the Children's removal, DCS clinical service specialist Melissa Weedman testified,

> I don't think that is likely, . . . look at the history of the case it started in 2006 and before [K.W.] was born, there has been a history of chronic neglect for the last eleven years. Do I believe that [Mother and Father] can pull it together for short periods of time? Yes I can. Do I think that they can keep their home clean and not neglect their children after we if we were not to be involved? No, no I don't think they could. Because they haven't.

Transcript, Volume II at 15-16. In light of Mother and Father's historical and current failure to remedy the conditions that resulted in the Children's removal, we conclude DCS presented sufficient evidence to show a reasonable probability the conditions leading to the Children's removal will not be remedied.[5]

---

[5] Mother and Father also contend the juvenile court erred in finding continuation of the parent-child relationship poses a threat to the Children's well-being. However, Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires only one element in that subsection be proven to support termination of parental rights. *See In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). Because we conclude the evidence is sufficient to show a reasonable probability the conditions resulting in the Children's removal will not be remedied, we need not also determine whether the juvenile court erred in concluding continuation of the parent-child relationship posed a threat to Children's well-being.

## B. Best Interests

Mother and Father argue DCS failed to prove termination of their parental rights was in the Children's best interest.[6] "In determining what is in the best interests of the child," the juvenile court "is required to look beyond the factors identified by the DCS and look to the totality of the evidence." *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009).

> The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Recommendations of the case manager and court-appointed advocate, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests.

*In re A.S.*, 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014) (citations omitted), *trans. denied*.

As noted above, there is sufficient evidence the conditions resulting in the Children's removal will not be remedied. In addition, Weedman, the Children's guardian ad litem Diana Rojahn, the DCS family case manager Gina McDonald, and the family's parent aid Robin Brown all agreed termination of Mother and Father's parental rights was in the Children's best interests. Further, we note permanency is a central consideration in

---

[6] Specifically, Mother and Father contend DCS did not call the current placement providers for the Children to testify what they believed was in the Children's best interests. However, Mother and Father cite to no case law to support how such evidence is required. This argument fails.

determining whether termination is in the Children's best interests. *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). The record reveals the Children have suffered from lack of permanency given DCS's longstanding involvement with the family. After the Children were removed in 2014, each flourished in foster care. However, when Mother and Father were allowed unsupervised home visits with the Children beginning in January 2015, the Children's behavior and attitudes regressed. And as McDonald testified, "[I]f the girls were to be reunified or returned home, I believe that there would be a huge regression in both girls as far as their progress. As far as their social skills, as far as their academics." Tr., Vol. III at 19. We conclude DCS presented sufficient evidence from which the juvenile court could conclude termination of Mother and Father's parental rights was in the Children's best interest.

## C. Satisfactory Plan

[23] Finally, Mother and Father contend DCS did not prove it had a satisfactory plan for the care and treatment of the Children. In order to terminate a parent-child relationship, the juvenile court must find there is a satisfactory plan for the care and treatment of the child. *In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*. "This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *Id.* Here, DCS admitted evidence that the plan for K.W. and K.M.W. was adoption, which is a satisfactory plan that offers a general sense of the direction the Children would go after termination of Mother and Father's parental rights. *See*

*id*.  DCS presented sufficient evidence from which the juvenile court could conclude DCS had a satisfactory plan for the Children.

# Conclusion

[24] DCS established by clear and convincing evidence the requisite elements to support the termination of Mother and Father's parental rights.  The judgment of the juvenile court terminating Mother and Father's parental rights is affirmed.

[25] Affirmed.

Riley, J., and Pyle, J., concur.