**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**MARIANNE WOOLBERT**
Anderson, Indiana

ATTORNEYS FOR APPELLEES:

**DOROTHY FERGUSON**
DCS, Madison County
Anderson, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana



FILED

Jan 13 2012, 9:22 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: J.H. & Ja.H., | ) ) ) |
| and | ) ) |
| M.H., (Mother) | ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) ) No. 48A05-1105-JT-225 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner. | ) ) ) |

APPEAL FROM THE MADISON SUPERIOR COURT
The Honorable G. George Pancol, Judge
Cause No. 48D02-1006-JT-322
48D02-1006-JT-323

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**ROBB, Chief Judge**

<u>Case Summary and Issue</u>

M.H. ("Mother") appeals the termination of her parental rights to her children, Ja.H. and Je.H., on petition of the Indiana Department of Child Services ("DCS"). Mother raises the sole issue of whether the trial court erred in terminating her parental rights. Concluding that the trial court did not commit error, we affirm.

<u>Facts and Procedural History</u>

Mother gave birth to Ja.H. in March 2002, and to Je.H. in April 2003. On September 2, 2009, DCS filed separate petitions alleging Ja.H. and Je.H. to be children in need of services ("CHINS"). DCS explained in these petitions that a recent report regarding Mother's household revealed unsanitary conditions.

> The home smells like ammonia with a wet and musty smell, like the basement is flooded. The inside of the home appears to be all torn up, like work is being done to it or as if it is dilapidated. There are concerns for the children living in the home. . . . The . . . family has extensive DCS history that includes: In 2004 [Mother] was SUBSTANTIATED against for Environment Life/Health Endangering and Lack of Supervision; in 2006 [Mother] was SUBSTANTIATED against for Environment Life/Health Endangering and Lack of Supervision; in 2008 [Mother] was INDICATED [sic] against for Environment Life/Health Endangering. Also in 2009 [Mother]'s live in boyfriend at the time, [B.D.F.] was SUBSTANTIATED against for Child

Molesting and Criminal Deviate Conduct with Ja.H. as the victim. On 8/20/2009 [the family case manager ("FCM")] went to the home . . . . [The FCM] had to go to the side door as the front door and front screened in porch were not accessible as there was so much stuff piled up, blocking the entrance. [The FCM] observed numerous cats on the front porch and the smell of ammonia and musty, damp stench could be smelled outside of the home. On 8/21/2009 . . ., [the FCM] went to the home again and met with [Mother]'s live in boyfriend, [T.S.]. [The] FCM observed [T.S.] to be "shoveling miscellaneous debris from the inside of the home into the back of a pick up truck. [T.S.] stated that he was "working on getting the house cleaned up." . . . On 8/21/2009 [the] FCM met with [Mother], [Ja.H.], [Je.H.] and [T.S.] in the home. [The] FCM . . . entered the home and observed the home conditions to be concerning. There was standing bleach water throughout the home. [Mother] and [T.S.] stated that they had dumped the water on the floors in efforts to clean the floors. The walls, furniture and appliances throughout the home were covered in splatters of dirt. There was also obvious mold on the walls. The home has seven dogs and fourteen plus cats in it. The basement was not accessible to this worker, as there was so much grime on the basement steps this worker did not feel comfortable navigating them. [Mother] and [T.S.] admitted that the basement is in very bad shape, with standing water and filth all over it. . . .

Appellant [sic] Appendix at 2-3 (regarding Je.H.); 4-5 (same regarding Ja.H.).

On September 15, 2009, the trial court adjudicated Ja.H. and Je.H. to be CHINS. The trial court then issued a dispositional order, providing for supervision of the children in the home while services are being completed. The trial court ordered Mother to "work with home based provider, [undergo] counseling, [undergo a] mental health evaluation, maintain a safe and clean home, [maintain] continued wardship, and [continue] parental participation." Id. at 22-23 (regarding Ja.H.); id. at 25-26 (regarding Je.H.).

On June 16, 2010, DCS filed petitions for involuntary termination of Mother's parental rights to both children. Following fact-finding hearings regarding these petitions, the trial court entered findings of fact and conclusions of law, including:

4. On or about August 19, 2009, the children were removed from the Mother's care as the home was determined to be unfit for the children to reside in with numerous dogs and cats, smells of ammonia, wet and mustiness from basement flooding, and overall condition of the home as it appeared to be in the process of remodeling and/or dilapidation.

5. That the Family Case Manager (FCM) . . . was familiar with the family and previously substantiated against Mother for other substantiations including environment/life health endangering, lack of supervision (2004 and 2006), then in 2008 Mother was indicated [sic] for environmental life/health endangerment as her live-in boyfriend, [sic] was substantiated against for child molesting and criminal deviate conduct with [Ja.H.] as the victim.

***

8. On or about October 14, 2009, this Court entered a dispositional order that required, in part . . . :

  a. Child to remain in the care and placement of the Department, including foster care.

  b. Mother must participate in the treatment plan of the Parental Participation Petition [sic]

  c. Mother must ". . . work with home based provider, counseling, mental health evaluation, maintain a safe and clean home, continued wardship, and parental participation."

9. On or about January 27, 2010, the Department . . . request[ed] the Court to order all visitations to stop as between Mother and minor children as Mother's psychological evaluation was pending and Mother's behavior was unstable. It was reported in said entry that Mother was taken to St. Vincent Stress Center . . . due to a possible suicide attempt. The entry also reported that a call was made by Mother to [an] FCM . . . stating that Mother was admitting herself to a mental hospital, would not sign any consent forms, and would not be at her supervised visits with her children.

***

11. On or about June 22, 2010, the Department files [sic] its Petition for Involuntary Termination of Parental Rights. . . .

12. Mother has had several attempts to obtain medical and psychological treatment as documented by records . . . ; all without successful completion and/or given directives to maintain a positive mental health.

***

14. Under the current underlying Child In Need of Services cases,Respondent-Mother [sic] failed to complete any court ordered services, with the exception of the psychological evaluation, but failed to comply with recommendations.

15. Mother failed to maintain adequate housing.

16. Both the children are in therapy.

17. Both children will continue to need therapy.

18. [An FCM] and the Court Appointed Special Advocate believe it is in the children's best interest that parental rights be terminated.

\*\*\*

CONCLUSIONS OF LAW

. . . There is a reasonable probability that the conditions resulting in the removal of the children from [Mother] will not be remedied. Respondent-Mother has been involved with DCS for many years and has the [sic] benefit of multiple services. Respondent-Mother has failed to successfully complete any court ordered services under the underlying children in need of services causes of action. Due to Respondent-Mother's frequent and long-term involvement with this Court and DCS, and the fact that she failed to complete any services, this court finds that there is a reasonable probability that the continuation of the parent-child relationship pose [sic] a threat to the well-being of the children. Termination of the parent child relationship is in the best interest of the children as both the Family Case Manager and CASA agree that termination would be in the children's best interest. The Indiana Department of Child Services, Local Office Madison County, has a satisfactory permanent plan for the care and treatment of the children, which is adoption by the current foster placement.

Id. at 36-39. Accordingly, the trial court terminated Mother's parental rights to Ja.H. and Je.H. Mother now appeals.

Discussion and Decision

I. Standard of Review

Our standard of review in termination of parental rights cases is well-settled:

When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. We consider only the evidence and reasonable inferences that are most favorable to the judgment. Here, the trial court entered findings of fact and conclusions thereon in granting the . . . petition to terminate . . . parental rights. When reviewing findings of fact and conclusions of law entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. We will set aside the trial court's judgment only if it is clearly erroneous.

5

<u>Bester v. Lake Cnty. Office of Family & Children</u>, 839 N.E.2d 143, 147 (Ind. 2005) (citations omitted).

## II. Termination of Mother's Parental Rights

Parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities. <u>In re Termination of Parent-Child Relationship of D.D.</u>, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), <u>trans. denied</u>. The purpose of terminating parental rights is not to punish parents, but to protect their children. <u>Id.</u>

To terminate Mother's parental rights to her children, DCS was required to plead and prove, among other things:

> (B) that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services; . . . .

Ind. Code § 31-35-2-4(b)(2).

Mother's sole appellate argument is that DCS failed to prove that the conditions resulting in the removal of the children would not be remedied, citing Indiana Code sub-paragraph 31-35-2-4(b)(2)(B)(i), which is quoted above. Mother does not contend that the trial court erred when it concluded that "there is a reasonable probability that the continuation of the parent-child relationship pose [sic] a threat to the well-being of the children." Appellant [sic] App. at 39. Because Mother does not challenge this conclusion and the

6

statute is written in the disjunctive, this unchallenged conclusion by the trial court is sufficient to uphold its order terminating the parent-child relationship.

In any event, Mother fails to persuade us that the conditions that resulted in the children's removal have been or are reasonably probable to be remedied. The record includes evidence that Mother's home has been observed to be unsanitary for the children on several occasions over a period of years. This was one of the major problems which led to the removal of her children. That Mother has permitted these conditions to repeatedly arise suggests Mother is not likely to remedy the situation. The evidence supports this finding which supports the judgment terminating Mother's parental rights.

Mother argues that at the time of the fact-finding hearings she had sought mental health treatment, began to voluntarily attend Alcoholics Anonymous, and moved to a new, clean residence. While we commend her initial efforts, we are constrained by our standard of review such that we must first determine whether the "evidence supports the findings, and second we determine whether the findings support the judgment." Bester, 839 N.E.2d at 147. The trial court explained Mother's pattern of beginning to seek psychological treatment and repeated failure to follow recommendations. This finding is supported by the record and supports the judgment.

The trial court also explained Mother's pattern of living in unsanitary conditions. While the record indicates Mother recently moved to a new residence that is unlikely to be unsanitary at present, the evidence supports the trial court's finding that Mother's usual living conditions are unsanitary, and it is reasonable to infer from this evidence that it may be

7

only a matter of time until Mother's current residence becomes uninhabitable for children. This also supports the judgment. A parent facing termination of parental rights largely due to squalid living conditions cannot avoid termination simply by moving to a new, clean residence immediately before a fact-finding hearing.

## Conclusion

Mother does not challenge the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the children. This unchallenged conclusion is sufficient to support the trial court's decision to terminate Mother's relationship with her children, Ja.H. and Je.H. Further, the evidence supports the trial court's findings that conditions which led to removal of the children are unlikely to be remedied and that continuation of the parent-child relationship poses a threat to the well-being of the children. Therefore, we affirm.

Affirmed.

NAJAM, J., and VAIDIK, J., concur.