## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 02 2019, 8:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of J.W. (Minor Child);

L.W. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

August 2, 2019

Court of Appeals Case No.
19A-JT-451

Appeal from the Vigo Circuit Court

The Honorable Sarah K. Mullican, Judge

The Honorable Daniel W. Kelly, Magistrate

Trial Court Cause No.
84C01-1802-JT-258

**Najam, Judge.**

# Statement of the Case

L.W. ("Mother") appeals the trial court's termination of her parental rights over her minor child, J.W. ("Child"). Mother presents a single issue for our review, namely, whether the State presented sufficient evidence to support the termination of her parental rights.

We affirm.

# Facts and Procedural History

Mother is the biological mother of Child, who was born on January 20, 2016. On March 7, 2017, DCS received a report that Mother had been involved in a domestic violence incident while Child and Child's six-year-old sister, A.L., were present. The report also indicated that Mother was using drugs and that the home was in poor condition. DCS substantiated the report and removed Child and A.L. from Mother's care. On March 13, DCS filed a petition alleging Child to be a Child in Need of Services ("CHINS").[1] After a hearing, the court adjudicated Child to be a CHINS. Thereafter, the court entered its dispositional order and instructed Mother to submit to a substance abuse assessment, a clinical interview and assessment, a mental health evaluation, and to random drugs screens. In addition, the court instructed Mother to participate in home-based case management and supervised visitation with Child.

---

[1] At the time, Mother was already involved with DCS due to the "educational neglect" of A.L. Ex. at 19.

[4] Mother "didn't complete any one service at any point in time." Tr. Vol. III at 139. Accordingly, on March 1, 2018, DCS filed a petition to terminate Mother's parental rights over Child. Following a hearing, the court granted the State's petition on August 20. In support of its order, the court entered the following findings and conclusions:

> c. There is a reasonable probability that the conditions which resulted in the removal of the child[] from [his] mother will not be remedied or the reasons for placement outside of the home of the parents will not be remedied or that the continuation of the parent-child relationship poses a threat to the well-being of the child[] as follows:

> 1. On or about March 7, 2017, the Department of Child Services received a report of domestic violence between [Child's] mother, [Mother], and her girlfriend. [Mother] was found to have suffered a gash on her forehead during the altercation. Also, a man pulled a gun on [Child's] mother in the presence of [Child] and his sister, [A.L.]. There were also allegations of Mother using heroin as well as filthy home conditions.

> 2. When the DCS assessment worker went to the home to investigate the report, Mother had two black eyes and acknowledged the domestic violence incident, stating that she had been hit in the face with a mag light. She also acknowledged that a man had pulled a gun on her. She told the [Family Case Manager ("FCM")] that she had not planned to make a police report regarding the incident for fear of retaliation.

> 3. DCS tried to persuade Mother to file for a no contact order or an order of protection, but she refused. She also refused to submit to a drug screen in order for DCS to determine whether

the children had a sober caregiver. [Mother] stated that she had lost her food stamps and there was little food in the home.

4. At the time of this assessment, [Child's] sister, [A.L.] had already been the subject of an Informal Adjustment related to poor school attendance. However, on March 9, 2017, she was again absent from school. When, on March 10, 2017, [A.L.] was again absent from school, both children were removed from Mother's care. When the assessment worker arrived at the home on that day, [A.L.] answered the door and reported that her mother was sleeping. She had no clean clothing. [Child] was in a Pak-N-Play with dried feces on him. There were cigarette butts within the child's reach. DCS determined that [A.L.] had missed 9 days of school in the past two months. [Child] had a serious medical condition, specifically, a shunt in the brain for hydrocephalus, but [Mother] had failed to schedule a follow-up appointment after the insertion of the shunt.

5. DCS put in extensive reunification services for [Mother]. She was assigned a care manager for Hamilton Center, who worked with [Mother] on her mental health, substance abuse, employment and housing. Mother admitted to ongoing use of meth and marijuana in June, 2017, when she began working with her. [Mother] was ordered to submit to a mental health assessment to determine if she met the criteria for a dual diagnosis group and was ordered to obtain individual counseling. She never participated in a mental health assessment and refused to meet with the first therapist, Dr. Jackson, who had been assigned to her. She was then to meet with Dr. Tyrone Powell for individual therapy, but was discharged from that service for missing multiple appointments without contact.

6. [Mother] was only able to obtain employment during the pendency of the CHINS case on two occasions, one job lasting for approximately two weeks and the other only two hours. She sought Social Security Disability, but was denied for failure to

follow through with her application. Therefore, she was unable to obtain any means of support for [Child]. The Hamilton Care Center Manager, Holly Neil, supervised one of [Mother's] supervised visits before they were moved to the DCS office, but [Mother] fell asleep during that visit.

7. Mother has been unable to maintain stable housing throughout the CHINS proceedings. She has resided temporarily in several shelters. She was in the Eagle Street house for three weeks, at Club Soda and Freebirds. She frequently moves and changes her phone number. The difficulty maintaining contact with Mother has been one of the many impediments to getting services to her. In addition, Mother has often been hostile, making it difficult to help her. On one occasion, Mother threatened to harm FCM Jennifer Lewis. [Mother] has been diagnosed with schizophrenia, but has rejected services to address her mental health needs.

8. When [Mother] sustained a broken leg, she refused to have a walking boot placed on her leg, stating that she felt the pump on the boot was being used to monitor her actions. Other examples of paranoid behavior were also given in court.

9. [Mother] has suffered multiple injuries from the various people with whom she has lived and associated herself. She has threatened her Hamilton Center care manager and family.

10. Dr. Tyrone Powell, who has provided psychological services to [Mother,] testified that she was referred to him for an assessment on September 5, 2017. He diagnosed her with schizoaffective disorder and substance abuse disorder, with methamphetamine and sedatives her preferred drugs. He said that she suffers from mood disturbance, delusions, paranoia and depression. Dr. Powell's goals were to help [Mother] deal with her depression and to help her develop coping skills for her

depression and anxiety without abusing drugs. He referred her to Hamilton Center's Matrix drug treatment program. She was also to meet with him one to two times per month, beginning September 5, 2017. By October 25, 2017, [Mother] had been kicked out of Eagle Street for taking another resident's medication. She was suffering from suicidal ideations and attempted to get herself run over in traffic. When Dr. Powell met with [Mother] the last time, on January 11, 2018, she was living at the Conner Center and had been homeless for the past two months. She admitted to having used drugs on Christmas Day, 2017 due to her continuing depression. He made a second referral to the Matrix program, but [Mother] failed to show for it.

11. [Mother] was referred to therapist Dominque Jackson after her in-patient stay, but never met with her and was closed out of that service for non-compliance.

12. [Mother] went to the Eagle Street transitional program for dual diagnosis females, which is a 90-day program. She stayed for three weeks in September of 2017. During her stay, she had numerous rule violations. She was eventually asked to leave the facility. No improvement was noted during her stay at Eagle Street.

13. Jennifer Norris worked with [Mother] as a care manager with Raintree Consulting. She was unable to get [Mother] employment. At one time, [Mother] got an apartment, but was quickly evicted and became homeless.

14. DCS Family Case Manager Jennifer Lewis was handling [Child's] sibling's Informal Adjustment when the CHINS case was opened on [Child]. Ms. Lewis put in a referral to Hamilton Center, since the Raintree referral had been closed out in April of 2017. [Mother] had an appointment for a substance abuse

assessment, and Ms. Lewis offered to drive her to the assessment. [Mother] refused to participate in the assessment.

15. Temporary housing was found for Mother at Club Soda, a sober living environment, after Mother had her leg broken with a baseball bat in a domestic violence incident. She was kicked out of Club Soda after two weeks for refusing to keep a cast on her broken leg.

16. Despite the court orders in the pending CHINS case, Mother never attended NA or AA meetings. DCS provided bus passes to [Mother] in June, August, September, October and November of 2017 and again in January of 2018 to ensure that she had transportation for purposes of attending services.

17. During a supervised visit, Mother smacked [Child] in the mouth, claiming that [Child] had bit her lip. In another supervised visit, [Mother] was extremely agitated and had difficulty sitting still. There were numerous incidents reported during the supervised visits. During a supervised visit on August 19, 2017, [Mother] fell asleep a couple of times during the visit. [Child's] sister, [A.L.] had to keep [Child] from putting chalk in his mouth. Mother ended that visit early. During a supervised visit on September 15, 2017, [Child] pulled the string on a toy bow and snapped it into his neck. [Mother] frequently was on her phone during visits and in October and November of 2017, she missed virtually all of her visits, claiming to have a job. When DCS attempted to have her get them her schedule so they could schedule around work, she did not cooperate. She eventually lost that job for too many no-shows.

18. In early 2018, DCS filed a modification to request that services be stopped. The court granted that modification March 15, 2018.

19.  No progress was made with regard to Mother's mental health or substance abuse, so none of the original concerns leading to removal have been remedied.

d.  Termination is in the best interests of the minor child as testified to by DCS and CASA.

e.  The Department of Child Services has a satisfactory plan for the care and treatment of the child[], which is adoption.

Appellant's App. Vol. II at 48-52.  Accordingly, the court terminated Mother's parental rights as to Child.  This appeal ensued.

# Discussion and Decision

[5]  We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Fam. & Child. (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*.  However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination.  *Schultz v. Porter Cty. Off. of Fam. & Child. (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001).  Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened.  *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities.  *Id.* at 836.

Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

> (B) that one (1) of the following is true:
>
>> (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * *
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2018).  DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'"  *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses.  *Peterson v. Marion Cty. Off. of Fam. & Child. (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*.  Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment.  *Id.*  Moreover, in deference to the trial

court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Off. of Fam. & Child. (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[8] Here, in terminating Mother's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[9] On appeal, Mother "does not dispute" that there is a reasonable probability that the conditions that resulted in Child's removal or continued placement outside of the home will not be remedied or that the continuation of the parent-child relationship poses a threat to the well-being of Child. Appellant's Br. at 7. Mother also does not dispute that there is a satisfactory plan for the care and treatment of Child. Rather, Mother only asserts that the trial court erred when it concluded that the termination of her parental rights is in the Child's best interests.

[10]     In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *A.S. v. Ind. Dep't of Child Servs. (In re A.K.)*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Off. of Fam. & Child.*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child." *In re A.K.*, 924 N.E.2d at 224.

[11]     Here, Mother contends that termination is not in Child's best interests because, while she "had not yet remedied all the conditions that led to [Child's] removal" as of the date of the fact-finding hearing, she "had secured housing" at an impatient treatment facility, had "maintained her sobriety" since entering the facility one week prior, had "reinitiated services" for mental health treatment, and "expressed sincere love" for Child. *Id*. at 8. In essence, Mother asserts that termination of her parental rights was not in Child's best interests because, "with additional time, she could indeed remedy" the conditions that led to Child's removal. Appellant's Br. at 8.

[12]     Mother's contentions on appeal amount to a request that we reweigh the evidence, which we cannot do. FCM Lewis testified that termination of Mother's parental rights is in Child's best interests. Additionally, the Court-Appointed Special Advocate testified that "[r]eintroducing [Mother] back into

[Child's] routine would not be in [Child's] best interest, as he has stability in his life now." Tr. Vol. III at 144. Further, the evidence demonstrates that Mother received referrals for several services, including for individual therapy, a mental health assessment, and a substance abuse assessment. But Mother did not participate in the mental health assessment. And while Mother initially met with a psychologist, she was later discharged from that service for failing to attend appointments.

[13] Mother has also failed to maintain stable housing. Throughout the proceeding, Mother lived at various shelters or slept on friends' couches. The longest amount of time Mother resided in any one place was for the three weeks she stayed in the Eagle Street house before she was kicked out for taking another resident's medication. In addition, Mother was referred to multiple substance abuse treatment programs, but she either did not attend or she left the program shortly after starting. As a result, Mother continues to use drugs. Indeed, Mother told her case manager that she was "in active meth use" as of June 2018, which was approximately one month before the fact-finding hearing. *Id*. at 41. And Mother testified that as of the date of the hearing she had only been sober for "a week." *Id*. at 164.

[14] Child needs consistent and reliable care, and he needs permanency. The totality of the evidence, including Mother's inability to provide a safe and stable home to Child and her failure to address her mental health and substance abuse issues, supports the trial court's conclusion that termination of Mother's

parental rights is in Child's best interests.   We therefore affirm the trial court's judgment.[2]

[15]   Affirmed.


Bailey, J., and May, J., concur.

_____

[2] Mother briefly asserts that "[t]he court failed to make any specific finding regarding why termination of Mother's parental rights was in [Child's] best interests, other than a general conclusory finding." Appellant's Br. at 7.  While the trial court did not make extensive findings to support its conclusion that termination is in Child's best interest, the court did find that termination is in Child's best interest "as testified to by DCS and CASA." Appellant's App. Vol. II at 52.  Accordingly, the trial court supported its conclusion with a specific finding, namely, that both DCS and the CASA testified that termination was in Child's best interest.